# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MICHELLE BARNETT** | * | **CIVIL ACTION NO.** |
| | * | |
| **VERSUS** | * | **JUDGE:** |
| | * | |
| **LOUISIANA DEPARTMENT OF** | * | |
| **HEALTH, formerly known as LOUISIANA** | * | **MAGISTRATE JUDGE** |
| **DEPARTMENT OF HEALTH AND** | * | |
| **HOSPITALS** | * | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### NATURE OF THE ACTION

This is an action asserted by **MICHELLE BARNETT** under Title VII of the Civil Rights Act, 42 U.S.C. § 2000, *et seq*. (hereinafter "Title VII") to correct unlawful discrimination and/or employment practices on the basis of gender and/or sex; under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*. (hereinafter the "ADEA") to correct unlawful discrimination and/or employment practices on the basis of age; under the Louisiana Human Rights Act, La. R.S. 51:2231, *et seq*. (hereinafter the "LHRA") to correct unlawful discrimination and/or employment practices on the basis of age; under the Louisiana Employment Discrimination Act, LSA-R.S. 23:301, *et seq*. (hereinafter the "LEDA") to correct unlawful discrimination and/or employment practices on the basis of age; under LEDA to correct unlawful discrimination and/or employment practices on the basis of gender and/or sex; under the Equal Pay Act of 1963, 29 U.S.C. § 206, *et seq*., as amended (hereinafter the "EPA") to correct inequities in pay on the basis of gender and/or sex; under the Louisiana Equal Pay for Women Act, La. R.S. 23:664, et seq.,

1

(hereinafter "LEPWA"); and to provide appropriate relief to **MICHELLE BARNETT**, who was injured by the discriminatory and wrongful practices set forth herein.

## JURISDICTION AND VENUE

1.

This action is instituted pursuant to the provisions of Federal and Louisiana state law. Jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. § 1331 and supplemental jurisdiction pursuant to the provisions of 28 U.S.C.A. § 1367.   Additionally, this Honorable Court has pendant jurisdiction over **MICHELLE BARNETT'S** claims based on state law.

2.

Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391.   The employment practices alleged to be unlawful were committed within the jurisdiction of this Court and a substantial part of the events or omissions giving rise to the claim occurred in this district.

3.

At all times relevant herein, **MICHELLE BARNETT** worked for Defendant within the Middle District of Louisiana, performed the functions of her position with Defendant in this district, and was supervised within this district.

## PARTIES

4.

**MICHELLE BARNETT** is a person of the full age of majority, who at all times relevant hereto was domiciled in the Parish of East Baton Rouge, State of Louisiana.

5.

Made defendant herein is Louisiana Department of Health formerly Louisiana Department

2

of Health and Hospitals (hereinafter "LDH").

6.

Defendants are justly and truly indebted unto **MICHELLE BARNETT** for all sums to which she is entitled by law in amounts that are reasonable under the premises, punitive damages as allowed by law, penalties as allowed by law, general damages and lost wages as allowed by law, all attorney's fees allowed by law, all court costs and litigation expenses incurred in these proceedings including, but not limited to, expert witness fees, together with legal interest from the date of judicial demand until paid in full, for all costs of these proceedings, and all other relief to which **MICHELLE BARNETT** is entitled at law or in equity.

**FACTS**

7.

**MICHELLE BARNETT** is 51 years of age.

8.

At all times relevant hereto, Defendant LDH employed **MICHELLE BARNETT**.

9.

At all times relevant hereto, Defendant LDH was an "employer" as defined in all applicable statutes including, but not limited to, 29 U.S.C. § 630, La. R.S. 51:2231, and La. R.S. 23:311.

10.

**MICHELLE BARNETT** was discriminated against, subjected to disparate treatment, denied equal opportunity in the terms and conditions of her employment with Defendant LDH, subjected to actions by Defendants that had a disparate impact on her, and retaliated against under

3

the following facts:

11.

On March 1, 2012, **MICHELLE BARNETT** was an employee of LDH who moved from its Medicaid division to its Office of Behavioral Health (hereinafter "OBH") as a Program Manager 2 (hereinafter "PM2").

To this new position, she brought extensive

- professional experience including twenty-four (24) years in Business Intelligence/Analytics (hereinafter "BI") in the fields of finance, insurance, energy, disaster management, education, information technology (including as a subcontractor with Microsoft Corporation on a major world-wide survey initiative) and most importantly healthcare;

- highly relevant educational experience consisting of a Bachelor's Degree in Mathematics, a Master's Degree in Applied Statistics where she was the 2007 Outstanding LSU Master's Student graduating with a 4.0 GPA, one of only approximately twelve SAS Advanced Certified Programmers in Louisiana and the only one in LDH, and was accepted into Rutgers University Graduate School for a doctorate degree in Healthcare Informatics;

- staff and organizational management experience as an Assistant Actuary, Vice President for a nation-wide corporation, Chief Forecaster for a statewide energy company, President of an energy consulting company, Mathematics Department Chair of local college, and LDH Assistant Section Chief over all physicians' programs in Louisiana who was responsible for a staff of nine professionals and a Seven Hundred Million dollar ($700,000,000.00) budget; and,

4

- program management experience throughout her entire career.

12.

During her tenure at OBH (03/01/12-11/12/13), **MICHELLE BARNETT** managed the creation and build-out of OBH's entire data warehouse, various cross walks for communication with numerous data systems and databases on a state and federal level, data dictionaries, and design specifications essentially creating the elemental foundations of all BI functions agency-wide.

13.

In conjunction with various vendors and contractors of LDH, she also directed all data collection efforts statewide and integrated data from various systems for use in federal regulatory reporting, state regulatory reporting, legislative requests, and general ad hoc requests that are necessary to monitor operations agency-wide.

14.

**MICHELLE BARNETT** also developed and implemented policies, protocols, and designs for system enhancements, system and database testing, data integrity, and was the BI lead person for all OBH agency rollouts of new initiatives, problems with existing programs, or initiatives which she led.

15.

Finally, she managed the rollout and implementation of a system which would allow Local Governing Entities, the administrative units which run the public behavioral health clinics throughout the state, to generate basic analytics in-house.

16.

As the management person within the Health Plan Management Division of OBH with the most experience, **MICHELLE BARNETT** became known as the person other employees, including her supervisors, could turn to for help in the performance of their duties.

17.

Throughout this time, she was a classified civil servant in the position of PM2 (Director of Analytics) and faithfully served in that capacity without any discipline whatsoever.

18.

In late May 2012, **MICHELLE BARNETT'S** supervisor, Randy Lemoine, Program Manager 4 (PM4) and Section Chief of Business Intelligence announced his retirement, suggested that she apply for his job (hereinafter the "PM4 Position"), and began training her on the duties for the PM4 Position.

19.

LDH first posted the opening for the PM4 Position during the summer of 2012 and because she was highly qualified and perfectly suited for it, **MICHELLE BARNETT** applied with LDH to fill the PM4 Position.

20.

A panel consisting of three OBH employees and two other LDH employees was created to conduct the interviews of the top candidates for the PM4 Position in an effort to, supposedly, ensure an outcome that no one would question.

21.

The panel named its top five applicants for the PM4 Position and scheduled them for

interviews.   **MICHELLE BARNETT** was one of the top five applicants and thus was included in the group scheduled for interviews.

22.

The panel created by LDH to fill this position interviewed **MICHELLE BARNETT** and confirmed that she was more than qualified for the PM4 Position, had been essentially serving in the PM4 Position, was working closely with Mr. Lemoine, and ranked her as the top applicant of all qualified applicants.

23.

Another one of the applicants for the PM4 Position was Joshua Hardy, a male under the age of 35 who was not even minimally qualified for this position as determined by LDH's own criteria since he had graduated with a Bachelor's degree only two years previously (the position required eight years of post-baccalaureate professional experience), and who, upon information and belief, falsified information on his application for the PM4 Position to suggest that he possessed the minimum qualifications for the PM4 Position.

24.

Natresha Duncan, Administrative Assistant to Randall Lemoine, worked on the applications and scheduling and confirmed that Hardy was not minimally qualified for this position and told both Anthony Speier (OBH Assistant Secretary) and Lemoine that Joshua Hardy could not be included in the final cut of applicants because of this disqualification.

25.

Lemoine responded to this fact by closing his office door and telling Natresha Duncan that he had no choice and he was being forced to include Hardy in the group of final applicants and to

7

interview him for the PM4 Position.

26.

While Defendant LDH knew about Hardy's disqualification for the PM4 Position at the time, **MICHELLE BARNETT** would not discover this fact until much later and it would be confirmed by Civil Service which determined that Hardy was indeed not minimally qualified for any PM4 level position with Defendant LDH much less the PM4 Position.

27.

After **MICHELLE BARNETT** filed her EEOC Charge of Discrimination, it was discovered that Hardy was given as an "informal interview", therefore any results from his interview should not have been included in his qualifications and/or application for the PM4 Position.   The combination of this unusual practice with the fact that Defendant LDH interviewed someone who was not even minimally qualified illustrates that OBH Executive Management was aware that Hardy was not minimally qualified for a PM4 level position and thus was not even eligible to be interviewed.   Yet even though they had this knowledge, they interviewed an unqualified male under the age of 35 and still did not promote the highest scored applicant, **MICHELLE BARNETT**.

28.

Weeks after the interviews in 2012, OBH falsely claimed that Hardy lacked only four months of the minimally-required experience. However, instead of promoting **MICHELLE BARNETT** to the PM4 Position in 2012 because she was the most qualified and highest scored eligible applicant, OBH made the curious decision to leave the PM4 Position unfilled.   Based upon what she was told and the facts surrounding the promotion, it was apparent that Defendant

8

LDH promised the PM4 Position to Hardy, a young, white male outside of the protected age class, and therefore OBH decided to leave this position open and unfilled in an attempt to allow Hardy to gain the required minimum work experience (supposedly four additional months) necessary for him to qualify for the PM4 Position before officially placing him in the PM4 Position.

29.

In light of Defendant LDH's decision to leave the PM4 Position vacant and with no leadership in the Section, **MICHELLE BARNETT** continued to work in the official capacity of and at the pay rate of a PM2 while unofficially filling and performing a majority of the duties of the PM4 Position after Mr. Lemoine's retirement, often being called upon by Executive Management to fill in as the Section Chief.

30.

Subsequently and with much fanfare, in mid-August 2012, Anthony Speier, OBH Assistant Secretary, stated in a bi-weekly meeting that Hardy would be starting on September 3, 2012 and would be needed for a Business Review with then LDH Secretary Bruce Greenstein. Hardy was being brought in as a systems and EBHR (Electronic Behavioral Health Record) expert to make sure Clinical Advisor (CA – private LDH contractor Magellan's billing system) got fixed.

31.

Therefore, in order to assist Hardy in obtaining the necessary minimum work experience for the PM4 Position, Defendant LDH promoted Joshua Hardy from a PM1-A position (which had no supervisory duties) to a PM2 position (which included supervisory duties and required prior supervisory experience that he did not have) as the EBHR expert even though he provided false information when he applied for the PM4 Position.   In doing so, Defendant LDH rewarded Hardy,

9

a male under the age of thirty-five (35) instead of disciplining him for falsifying his application.

32.

In rewarding Hardy, Defendant LDH punished **MICHELLE BARNETT** and violated its own rules because no interviews were conducted for this PM2 position.   Defendant LDH instead simply placed Hardy into it even though there were female employees and employees over the age of forty (40) who applied, who were more qualified than Hardy, and who had actually been working in the section for years.

33.

As of 2017 (for over six years), **MICHELLE BARNETT** had yet to be promoted anywhere within LDH, despite her vast education and experience, excellent work performance, and the many positions for which she applied and was more than qualified to fill.

34.

In contrast, under the discriminatory regime, Defendant LDH repeatedly promoted men and younger employees outside the protected age class such as Hardy.

35.

For example, Defendant LDH promoted Hardy five times over four years even though he had far less educational credentials, noticeably less work experience (including less experience with Defendant LDH), as well as questionable work performance/attendance.   These promotions included the following:

- o   2010 Program Specialist
- o   2011 Program Monitor
- o   2012 Program Manager 1A

- 2012 (fall) Program Manager 2
- 2013 Program Manager 4

36.

Almost immediately after being promoted to PM2, Joshua Hardy proved that he was not qualified for this position in substantive knowledge, supervisory experience, and job performance.

37.

One way he proved this was through the harassment he began subjecting **MICHELLE BARNETT** to with the full knowledge and approval of Defendant LDH.   Examples of this harassment include, but are not limited to, the following:

1. Causing morale problems with her staff and adding management and work stress;

2. Attempting to circumvent her authority within her own department;

3. Attempting to circumvent her authority with her own staff;

4. Ignoring her complaints of harassment;

5. Gaining access under false pretenses to the locked office of one of her employees and taking a brand new boxed computer without notifying her or her staff;

6. Entering her locked office on multiple occasions without her permission when she was not present;

7. He was able to gain access repeatedly under false pretenses by telling the OBH Assistant Secretary's Administrative Assistant that he had forgotten his key.

8. Making false statements about her to their common supervisor;

9. Sabotaging a statewide training seminar that her staff and she had worked very long and hard on by canceling their GoTo Meeting account the night before the event for no reason and no forewarning.

### 38.

**MICHELLE BARNETT** complained repeatedly to Defendant LDH by reporting the harassment to their common supervisor, Karen Stubbs, but nothing was done to stop the harassment or to punish those who harassed her, including Hardy.

### 39.

After being promoted to the PM2 position for which he was unqualified, Hardy was absent from work a large portion of each work week with no warning, reason, or explanation. These absences meant that **MICHELLE BARNETT** and her staff had to cover for Hardy and perform the work that he was supposed to perform but had not performed due to his unexplained absences.

### 40.

In fact, Hardy's absences became so common that his own supervisors, staff, and co-workers would stop by **MICHELLE BARNETT'S** office and inquire about his whereabouts.

### 41.

This led to growing frustration agency-wide because Hardy was not around to help with IT issues or attend meetings that were both part of his job duties. In one instance, staff discovered that Hardy was in Washington, D.C. for the entire week with a number of other LDH IT young men on a taxpayer-funded event. He had not informed anyone that he was going to be out that week; neither his supervisor nor his subordinate staff nor the executive management knew of his absence. This fact was discovered accidentally in a conversation with LDH OBH's behavioral

12

health contractor, Magellan.    Hardy was not disciplined for this even after his supervisor was informed.

42.

Despite these absences, Defendant LDH neither disciplined Hardy for his absenteeism nor rewarded **MICHELLE BARNETT** for performing some of his job duties during his absences along with duties of the PM4 Position which remained open.

43.

Subsequently, in February of 2013, Defendant LDH posted a second job announcement for the PM4 Position.    This announcement coincided with the completion of the supposed four (4) months of additional experience that Hardy required to meet the minimum experience eligibility requirements for the PM4 Position.

44.

This February 2013 posting for the PM4 Position required a minimum of "A baccalaureate degree plus **eight** years of professional experience in business operations, economics, public health, public relations, research and evaluation, or in providing social services or health services. **Three years of this experience must have been at the supervisory level or above**." "Preference will be given to candidates with experience in managing a **large complex** or multi-focused work unit in the following areas: Health information Management (systems/ operations), business intelligence healthcare **analytics** and Healthcare **Claims Processing**." "This vacancy may be filled only by the promotion of a permanent state employee within the Office of Behavioral Health of the Department of Health and Hospitals, or in the Department of Health and Hospitals."    (Emphasis added).

13

45.

It is noteworthy that Civil Service rules define professional experience as post-baccalaureate experience.   Hardy had approximately two years of post-baccalaureate experience and no supervisory experience when he was first promised this PM4 Position six months previously; six months later he still met neither the professional level nor the supervisory experience requirements that Defendant set for the PM4 Position.

46.

Since **MICHELLE BARNETT** was now even more qualified for the PM4 Position, she again applied for it and unsuccessfully attempted to meet with Anthony Speier to discuss her concerns regarding the prior favorable treatment that Hardy received relating to the PM4 Position and the rumors that the position had been promised to him the previous year.

47.

Defendant LDH closed the posting for the PM4 Position on February 18, 2013.

48.

On February 19, 2013 OBH Human Resources Director Ruby Triggs informed **MICHELLE BARNETT** that the decision had already been made the year before and that Hardy would be placed into the PM4 Position as he had been promised.

49.

**MICHELLE BARNETT** responded to this information by advising Triggs that:

- she had incomparably more professional level experience than Joshua Hardy (over 20 years vs. 2 years).

14

- she had more relevant education than Hardy (Master's degree vs. no graduate degree). Both of her degrees are in the very technical fields of mathematics and statistics while his was economics (bachelor of arts) and political science.
- Hardy was rarely present in his office or the department.
- she was performing some of Hardy's duties because of his frequent absences from the office.
- The only reason Hardy was being promoted to the PM4 Position was because he was a young, white male and many such employees were being promoted and treated favorably while older female employees were being punished and/or denied opportunities for promotion.

50.

Triggs was very understanding and agreed that what was happening with Hardy was not right.

51.

**MICHELLE BARNETT** also told Triggs that if Defendant LDH went through with this unlawful action, then she would take legal action.   Fearing that she would be retaliated against before obtaining permanent status, Triggs told her to wait until after February 28, 2013 to complain so that her permanent status would be complete. Triggs' concern and warning made it clear to **MICHELLE BARNETT** that LDH would retaliate against her if she complained.

52.

Thus, Defendant LDH wanted to place Hardy in the PM4 Position merely because he was a white male under the age of 35 even though he

15

- did not have even the minimum required professional level experience;

- did not have even the minimum required supervisory level experience;

- did not have the relevant work experience for the position that she had;

- did not have as extensive of an educational background as she did;

- had far less supervisory experience than she had (only six months as opposed to the **required** three years);

- had a poor performance record at LDH compared to her record;

- had a poor attendance record at LDH compared to her record; and,

- had no experience in the PM4 Position while she had already served in this position.   In reality, the only credentials he needed were that he was a young, white male.

53.

With no explanation, LDH again left the PM4 Position open for months in 2013.   Upon information and belief, LDH again left the PM4 Position unfilled only because **MICHELLE BARNETT** threatened legal action against LDH.

54.

During the months in 2013 that the PM4 Position remained unfilled, the harassment and discrimination that Defendant LDH subjected **MICHELLE BARNETT** to continued and even intensified with the hiring of Karen Stubbs, a female under the age of 40 who was also a friend of Hardy, as OBH Deputy Assistant Secretary.   Both Hardy and **MICHELLE BARNETT** began reporting to Ms. Stubbs.

55.

At that time, one of the duties assigned to Hardy in an attempt to provide him with the

16

supervisory experience he needed to qualify for the PM4 Position was the implementation

Magellan's Clinical Advisor system.

56.

However, according to the Louisiana Legislative Auditor's (LLA) Report issued in August

2013, Clinical Advisor was deemed a failure and was causing significant problems to providers

statewide.   Therefore, Hardy failed to perform the work that he was responsible for and

specifically hired to do, namely to ensure the successful implementation of Magellan's Clinical

Advisor system.

57.

Despite this damaging LLA report, Defendant LDH again ignored Hardy's substandard job

performance and his lack of qualifications for promotion when it promoted him to fill a PM4

Medicaid position outside of OBH after August 2013.

58.

Around October 8, 2013, following the announcement that Hardy was leaving OBH,

**MICHELLE BARNETT** complained about his promotion to PM4 in Medicaid since he was

unqualified and again requested that she be promoted to PM4 in general and the PM4 Position in

particular, which had been vacant for over a year now.   In response to this complaint and request,

Stubbs told **MICHELLE BARNETT** that she would not be promoted to PM4 due to Hardy; thus

for the third time, Defendant LDH intentionally discriminated against her by failing to promote her

to PM4, by leaving the PM4 Position open so it could be filled by a white male outside of the

protected age class who was clearly unqualified for and had falsified his application for the

position, and by promoting Hardy to PM4.

17

59.

Stubbs further stated that Hardy was being detailed (temporarily placed) into the Medicaid PM4 position after which he could conceivably be returning to his position as PM2 in OBH and therefore it would be problematic for him to return if **MICHELLE BARNETT** was in the PM4 Position since he would have to report to her.   In contrast, there was no such concern for **MICHELLE BARNETT** when Hardy was to be promoted on two previous occasions to the PM4 Position and thus was to become her supervisor.

60.

Defendant LDH's promotion of Hardy to fill another PM4 opening in its Medicaid unit again involved discrimination against more experienced, educated, older persons for the position, including **MICHELLE BARNETT** herself, – PhD and master's level employees with many more years of experience.   It was discovered later that the Medicaid Deputy Director who supervised Hardy in Medicaid admitted that she had no choice in the matter when Hardy was promoted to the PM4 position.   This was the exact same thing that was attempted in OBH in favor of Hardy and against **MICHELLE BARNETT** until she complained and objected.   Unfortunately, Defendant LDH has retaliated against and harassed her ever since she has done so.

61.

In response to Hardy's promotion to PM4 in Medicaid, **MICHELLE BARNETT** questioned the rejection, for the third time, of her application for and requests to fill the PM4 Position and even offered to continue performing the duties of both her current PM2 job and the PM4 Position if LDH promoted her to the PM4 Position.   LDH rejected this offer without explanation.

18

62.

This continuing discriminatory treatment against her began to have a serious toll on **MICHELLE BARNETT'S** physical, emotional, and mental health when in the Fall of 2013 she had an anxiety attack during a meeting at LDH.   This attack was so severe that she had to rush out of the meeting with what felt like a heart attack.   Since the chest pains experienced during this attack would not subside, she had to go to the emergency room of a local hospital where tests and an EKG were done.   Several hours later, the chest pains finally subsided and her physician believed she was having a panic/anxiety attack over all of the stress she was under.

63.

The following month on November 12, 2013, Defendant LDH improperly and wrongfully placed **MICHELLE BARNETT** on suspension. Upon information and belief and based on this exact pattern happening to someone else for the same complaints of illegal hiring and promotion practices, LDH retaliated against her after she complained about the discrimination by, unknown to **MICHELLE BARNETT** at the time, filing an Agency Head Report to the Louisiana Ethics Board replete with falsehoods and lies regarding the employment of her husband, Tom Barnett with an LDH contractor.

64.

Defendant LDH made these false accusations even though it had actual knowledge of Tom Barnett's employment as well as the absence of any impermissible conflict of interest relating thereto for more than a year.   It was only after **MICHELLE BARNETT** complained of discrimination that LDH disregarded the facts and made these false accusations.   It is also noteworthy that LDH made these false accusations without speaking to either her or her supervisor

19

to ascertain the veracity of the statements contained in their Agency Head Report.

65.

Defendant LDH made these accusations for the first time even though it had been informed of her husband's employment more than one year earlier.

66.

After being advised of this employment in the summer of 2012, **MICHELLE BARNETT'S** supervisors, including Randall Lemoine and all of OBH's Executive Management Team, told her that there was no conflict and nothing that needed to be done.   She relied on their expertise and counsel regarding this matter.   Only, after **MICHELLE BARNETT** had spent the previous year protesting discrimination and harassment, including repeatedly being denied promotions, did Defendant LDH even suggest that she committed an ethics violation.   By doing so, Defendant LDH improperly sought to harass and retaliate against **MICHELLE BARNETT** by improperly using the state ethics laws as a weapon against her and her husband.

67.

After improperly suspending her, Defendant LDH humiliated **MICHELLE BARNETT** by escorting her to her office and out of the building in full view of her staff and co-workers without any explanation or justification and advising her that she could have no contact with her staff or anyone in LDH whatsoever.

68.

Defendant LDH also went so far as to inform her staff that it could have no contact with her whatsoever.   In doing so, LDH interfered from that date (11/12/13) to the present time, with and explicitly threatened her and her former staff members' and colleagues' right to assemble and

20

simply speak with each other without fear and intimidation.

69.

Since that time, **MICHELLE BARNETT** had staff members periodically approach her about the intimidation and retaliation they faced after being seen speaking with her.

70.

Despite the fact that disclosing information on a potential ethics investigation is strictly prohibited by state law and is considered a misdemeanor, Defendant LDH further harassed and retaliated against **MICHELLE BARNETT** by wrongfully disclosing to Hardy the reason for her suspension and within hours afterwards, he began to defame and slander her by telling her co-workers that she had committed an "ethical violation" and was suspended due to this violation. His statements were made before Defendant LDH had even completed an internal investigation, before LDH Executive Counsel had submitted an agency head report to the Ethics Board and before the Ethics Board had even voted to investigate - all in direct conflict with the confidentiality rules of the Board of Ethics and the rights of **MICHELLE BARNETT**.

71.

On December 19, 2013 via phone call, **MICHELLE BARNETT** was told by Defendant Lauren Guttzeit that its investigation of her was complete, that she had not violated any ethics rules or committed any other wrongdoing, and that she was very highly thought of and valued at LDH.

72.

On January 6, 2014, **MICHELLE BARNETT** was told to report back to work the next day.   However, instead of returning to OBH, she was told that at least for the time being she would work with LDH Deputy Secretary Courtney Phillips.   Defendant LDH also told her that

21

this assignment was temporary and she would be returned to her previous position and back in good standing upon the completion of the (supposed) advisory opinion requested from the State of Louisiana Board of Ethics by LDH.

73.

In response thereto, **MICHELLE BARNETT** attempted to obtain from Steve Russo, LDH Executive Counsel, any documentation that had been submitted to the Board of Ethics and sent by the Board itself about her so that she would be able to defend herself.   She also attempted to contact the Louisiana Board of Ethics via email for the same reason.   Lastly, she attempted to speak with a representative of the Louisiana Board of Ethics on March 6, 2014 to obtain same.

74.

In all cases, **MICHELLE BARNETT** was told nothing and was kept in the dark about what she had supposedly done wrong.   No one would answer her questions and no one would help her understand why these actions involving Ethics were being taken against her when she had been completely honest and upfront disclosing her husband's employment from the beginning.   Most importantly, no one would explain to her why Defendant LDH repeatedly advised her that her husband's employment did not constitute an ethics violation before she began complaining about discrimination, but now alleged to the Louisiana Board of Ethics that this employment caused her to commit an ethics violation.

75

Instead, she eventually discovered that Defendant LDH blatantly lied to her on several occasions when it repeatedly told her that her placement into a permanent position was on hold pending the results of an advisory opinion request they had filed with the Louisiana Board of

Ethics.   Defendant LDH eventually admitted to her that they had never requested an advisory opinion from the Louisiana Board of Ethics.

76.

This uncertainty regarding her status and the cloud that had been created over her as an employee has left her career in tatters and denied her the right to apply and be considered for promotions within Defendant LDH as evidenced, in part, by the fact that she continues to apply for promotions that she is well qualified for but LDH will not consider her for or even interview her for these promotions.

77.

Even though **MICHELLE BARNETT** retained her salary, her demotion from PM2 in OBH to working with LDH Deputy Secretary Courtney Phillips caused her harm including, but not limited to the loss of her staff, her title, her own office, her own printer, her own phone, her road to advancement, any possibility for promotion, as well as an exciting position where she felt like she was really making a substantive impact on people's lives in healthcare.

78.

This demotion followed her complaints regarding the discrimination and other unlawful treatment to which Defendant LDH subjected her.   This is especially distressing since at no time prior to her demotion did she ever receive any negative reviews much less any suggestion that she violated LDH rules or state law as alleged for the first time when she was demoted.

79.

At the time of her demotion, **MICHELLE BARNETT** was the oldest staff member in her section working within the technical arena.   Karen Stubbs, LDH/OBH Deputy Assistant

23

Secretary, was her supervisor and she supervised the following employees at that time:

1)    Michelle Barnett, Program Manager, <u>48-year-old white female</u> when demoted/ removed from position

2)    Joshua Hardy, Program Manager, <u>early 30's white male</u>

3)    Michael Carrone, Program Manager, <u>early 30's white male</u>

4)    Chris McCurnin, Program Manager, <u>early 30's white male</u>

5)    Kashunda Williams, Program Manager, <u>mid 30's black female</u>

6)    Kolynda Parker, Program Monitor, <u>mid to late 30's black female</u>

7)    Joanna Tonguis, Program Manager, <u>early 30's white female</u>

8)    Elizabeth Eaton, Program Manager, <u>early 30's white female</u>

9)    Lori Marshall, Program Manager, <u>early 30's black female</u>

80.

Upon information and belief the demotion, the removal from LDH OBH, and bogus ethics charges were in direct retaliation from her repeated complaints about gender and age discrimination beginning in 2012, her threats of legal action, and her complaints about being passed over for promotion and in favor of a young, white male with vastly less experience and education than she had.   This retaliation continues to this day as she has applied for over 100 positions at LDH since she complained about LDH's illegal hiring and promotion practices, and she continues to be discriminated against in favor of white, often young, males who are promoted instead of her, all with fewer qualifications than her especially in the area of technical positions.

81.

Subsequently in approximately December 2013, LDH posted the original PM4 Position

24

opening for the third time since it became vacant 18 months earlier.    However, this announcement

contained very different language than the two previous postings including language that was not

specific to Business Intelligence (BI) or even to an LDH employee.

82.

First, the minimum required professional level experience for the PM4 Position was

dramatically reduced from eight years to five years.    Second, the minimum **supervisory**

**experience** required for the position was **removed entirely** after first being set at three years.

Third, the preference language was changed to be overly generic in order to enable someone, with

little to no healthcare experience, no healthcare services systems/data warehouse/analytical

experience, no programming experience, and no graduate degree to be eligible for and placed into

this position.    Specifically, the posting sought "A baccalaureate degree plus **five** years of

professional level experience in administrative services, economics, public health, public

relations, or in providing social services or health services.    Preference will be given to candidates

with the following experience in working with and/or managing contracts of private vendors,

working on and/or managing projects involving multiple funding streams, multiple agencies and

different data sources, project management and development of protocols and policies associated

with project in particular with regard to build out of vendor systems."    (Emphasis added).

83.

Upon information and belief, Defendant LDH changed the requirements for the PM4

Position in an effort to prevent **MICHELLE BARNETT** from being promoted to the position in

retaliation for her outspoken criticism of the discrimination, retaliation, mistreatment, and

harassment to which she had been subjected and as part of LDH's continued unlawful treatment of

25

her.

84.

Despite these changes to the PM4 Position posting, **MICHELLE BARNETT** not only

was still qualified for the PM4 Position but upon information and belief she was once again the

most, or one of the most, qualified candidate for the PM4 Position.

85.

LDH closed the PM4 Position announcement on January 15, 2014.   The next day,

**MICHELLE BARNETT** spoke with OBH Interim Assistant Secretary Dr. Rochelle Dunham

about all of the discrimination, retaliation, mistreatment, and harassment that LDH had

continuously subjected her to throughout the previous twenty (20) months and her fear that she

was being shut out of the PM4 Position as retaliation.   During this conversation, **MICHELLE**

**BARNETT** confirmed that she had previously complained about this discrimination, retaliation,

and harassment her to supervisor, Karen Stubbs, but nothing was done to stop this wrongful

conduct or to allay her fears or concerns.   During this conversation, Dunham admitted to

**MICHELLE BARNETT** that she could not understand why LDH failed to promote her to the

PM4 Position because, in her mind, **MICHELLE BARNETT** was ideally suited for it.

86.

On February 13, 2014, **MICHELLE BARNETT** spoke with LDH Human Resources

Director, Lauren Guttzeit about all of the discrimination, retaliation, mistreatment, and harassment

that Defendant LDH had continuously subjected her to throughout the previous twenty (20)

months and her fear that she was again being wrongfully denied promotion to PM4 and/or the PM4

Position.   In response, Ms. Guttzeit told her that she would speak to Courtney Phillips, LDH

26

Deputy Undersecretary about what could be done; nothing was done. Instead, the discrimination, retaliation, mistreatment, and harassment continued.

87.

On February 20, 2014, **MICHELLE BARNETT** spoke with LDH Executive Counsel, Steve Russo about all of the discrimination, retaliation, mistreatment, and harassment that Defendant LDH had continuously subjected her to throughout the previous twenty (20) months and her fear that she was again being wrongfully denied promotion to PM4 and/or the PM4 Position.   Nothing changed and instead the discrimination, retaliation, mistreatment, and harassment continued.

88.

On March 5, 2014, **MICHELLE BARNETT** spoke with LDH Deputy Undersecretary, Courtney Phillips, about all of the discrimination, retaliation, mistreatment, and harassment that Defendant LDH had continuously subjected her to over the last twenty (20) months and her belief that she was again shut out of the PM4 Position.   Phillips told **MICHELLE BARNETT** that it was her decision to fill the position without waiting and made it clear that she would not be returning to OBH.   Thus, the discrimination retaliation, mistreatment, and harassment continued.

89.

In summary, over a seven-week time frame **MICHELLE BARNETT** spoke to four high level LDH executives (Assistant Secretary of OBH, LDH Human Resources Director, LDH Executive Counsel, and LDH Deputy Secretary) to inform them of the discrimination, retaliation, mistreatment, and harassment that Defendant LDH had continuously subjected her to and which she had repeatedly complained about to others at LDH.    None of them made an attempt to stop it,

27

mitigate it, or even investigate these claims much less the personal and professional damage she was suffering.

90.

To this day, **MICHELLE BARNETT** has been highly qualified for over 100 similar promotional opportunities in LDH (ten repeated postings of the same PM4 Position which was eventually permanently filled not by Hardy, but by another young, white wholly unqualified male) for which **MICHELLE BARNETT** was ideally suited.   She was never even contacted for an interview and most of the positions, in particular the technical ones, were filled with young, white males.

91.

Unfortunately, Defendant LDH's wrongful, intentional, discriminatory, and retaliatory treatment of **MICHELLE BARNETT** continued and in some cases worsened after these meetings and her subsequent move, without any choice, to another position within LDH, Program Integrity (PI).

92.

Upon her move to PI, **MICHELLE BARNETT'S** new supervisor, a 25-year LDH veteran, told her that she was placed into the absolute worst spot if LDH was truly attempting to stop or otherwise respond to the continuing discrimination, retaliation, mistreatment, and harassment.

93.

In confirmation of her new supervisor's warning, the unlawful behavior continued against **MICHELLE BARNETT** with the following actions lasting over a year which further evidenced

the systematic and protracted discrimination, retaliation, mistreatment, and harassment she suffered at the hands of LDH.

94.

First, after only two weeks in PI and the day after Defendant LDH was served with the petition for her state lawsuit, **MICHELLE BARNETT** was pressured to sign a Conditional Offer of Employment. This document provided that **MICHELLE BARNETT** would lose her Civil Service protections, state benefits, and leave time in the event of a layoff she (she refused to sign).

95.

Additionally, the Section Chief of PI, John Korduner, berated her work and efforts in front of her staff members only one month after her arrival into PI.

96.

Also, Korduner told her that no one knew what to do with her and that she should "quit doing Analytics" (supposedly she was moved there to be the Manager of Analytics).

97.

During this time, she repeatedly noticed the disparity between how male and female professionals were treated.

98.

To make matters worse, **MICHELLE BARNETT** had no input into the hiring of her first analytics staff member. This was a repeat of the same unlawful conduct to which she had been subjected to and spoke out against in OBH -a white male, who was compensated at an 18% higher salary than **MICHELLE BARNETT** even though she was his supervisor and had infinitely more experience and academic credentials than he had.

29

99.

Because of this unlawful disparity in pay, she requested an Optional Pay Adjustment (OPA –a Civil Service accommodation to deal exactly with this scenario where supervisors are compensated at a lower rate than their staff) and/or a promotion to deal with the disparity in salary and the increasing responsibilities she continued to assume upon arriving into PI.   Defendant LDH denied and/or ignored these requests without explanation.

100.

Very shortly after moving to PI, **MICHELLE BARNETT**'s supervisor, Quint O'Connor, informed her that she should be very careful, that she was not spoken kindly of by the two upper-level white male managers of the section (Bill Root, Chief Compliance Officer and John Korduner, Section Chief of PI) and that they were looking for any opportunity to get rid of her. As can be expected, this was very difficult for her to hear because it confirmed that she was not even being given a chance to success since this occurred almost immediately after she started in PI.

101.

Over time, the discrimination, retaliation, mistreatment, and harassment took the form of an ongoing, deliberate campaign to continuously make her feel isolated, to treat her differently than all other managers in the department, and to exclude her from communications regarding both her staff and her areas of responsibility.

102.

**MICHELLE BARNETT** repeatedly brought this unlawful conduct to the attention of those perpetrating it and repeatedly requested to be kept in the loop of issues involving her staff or her areas of responsibility – to no avail.

103.

This conduct began with two supervisors above her (Root and Korduner) but eventually spread to insubordination from her direct reports (two young, white males who she believes were taking their cues from and being encouraged to do so by Root and Korduner). These instances even included situations in which Root and Korduner went three and four levels below themselves, past herself, to include her subordinates in discussions and meetings while intentionally excluding her.

104.

This isolation was very humiliating and stressful and resulted in damage to **MICHELLE BARNETT** as well as to the team relationships and cohesiveness that **MICHELLE BARNETT** was trying to build in her new unit because the behavior so seriously undermined her authority. Others outside of her unit but within PI began to notice and ask her what was going on and why she didn't know things that were clearly under her purview regarding her staff. This made her look incompetent to her peers and superiors and was humiliating and embarrassing.

105.

After **MICHELLE BARNETT** complained about the discrimination, retaliation, mistreatment, and harassment from Root and Korduner, they continued this mistreatment of her "by proxy" through her direct supervisor, Quint O'Connor.

106.

Mr. O'Connor had no problems with **MICHELLE BARNETT** and believed that she was an excellent employee who produced high quality work and had an excellent working relationship with her. However, he could not handle the stress of being forced to treat her the way that Root

and Korduner wanted him to.    Therefore, O'Connor reluctantly placed a formal request with LDH

Human Resources that either Root and Korduner cease attempting to harass, abuse, and mistreat

her through him or have her removed from his direct supervision.    Inexplicably, Defendant LDH

chose not to stop this unlawful conduct and instead opted for the latter option by requiring that she

report directly to her primary harasser, Korduner.    This was devastating to her.

107.

The situation became most critical for **MICHELLE BARNETT** in April 2015 when she

was attempting to fill two highly technical positions within her unit.    Korduner and Root tried to

force her to hire an unqualified, young, white male under very questionable circumstances.    This

individual had been working at the LLA office and, according to Korduner, was working on LDH

audits at a time when he was trying to get a job with LDH.

108.

Before the job posting even closed, Korduner pressured **MICHELLE BARNETT** to

**<u>guarantee</u>** that if this person applied for the position, she would hire him.    This person needed

this guarantee before he applied online because he hadn't told his supervisors yet that he was

trying to get a job with LDH.

109.

**MICHELLE BARNETT** knew that it was at the very least inappropriate for an auditor to

be seeking a job with the entity he was auditing, and that it was strictly against LLA office rules.

110.

Additionally, this young, white male did not have the qualifications required for the

position – namely SAS programming experience.    Thus, **MICHELLE BARNETT** was now

32

being required to participate in what appeared to be the same type of age and gender discrimination that was perpetrated against her previously by LDH-OBH – an unqualified, young, white male was to be promised a position without regard to other older more qualified applicants.

111.

It was at this time that **MICHELLE BARNETT** realized the problem with discrimination within Defendant LDH was not isolated to one agency or group of people, it was rampant and systemic throughout the entire agency (OBH, Medicaid, and now the Office of the Secretary – three of the six agencies under the LDH umbrella).

112.

Therefore, on May 18, 2015, **MICHELLE BARNETT** sent a _Confidential_ Request for Guidance to the LDH HR Director, Lauren Guttzeit.   This request involved the possible unethical position she was being placed in by being forced to hire someone who was auditing LDH and the discriminatory actions she was being forced to take part in by hiring an unqualified, young, white male over older more qualified applicants including females.   Almost immediately after doing so, both Root and Korduner increased the levels of hostility and isolation that they subjected her to so that they occurred on an almost daily basis.

113.

During the ensuing Human Resources investigation, O'Connor (**MICHELLE BARNETT's** supervisor) was interviewed in June 2015 by LDH HR regarding.   Afterwards, he said "I don't think they're going to do a damn thing."

114.

O'Connor did not feel comfortable about the interview and told **MICHELLE BARNETT**

33

that "if HR didn't do something to rein them (Root and Korduner) in, there would be hell to pay" for both himself and her.

115.

When LDH HR interviewed **MICHELLE BARNETT** on June 11, 2015, she told them that it was unconscionable to her that not only did she have to fight being discriminated against but now she had to fight against having to take part in discrimination against others.   Defendant LDH did nothing except subject her to more discrimination, retaliation, mistreatment, and harassment.

116.

Six weeks after **MICHELLE BARNETT'S** initial request for guidance, Guttzeit responded on June 26, 2015 via memorandum in which she repeated everything contained in her original *confidential* request for guidance email, the identities of those persons who were interviewed during the investigation, and HR's conclusion that nothing improper occurred.   This memorandum was sent to the very subjects of the investigation – Root and Korduner – confirming that Defendant LDH violated **MICHELLE BARNETT'S** right to confidentiality regarding her complaints and that LDH had no interest in putting an end to the discrimination and harassment to which it continued to subject her.

117.

Only one week later on July 6, 2015, **MICHELLE BARNETT** was informed that two of her three units of responsibility, Compliance and Managed Care Oversight including staff, were being removed from her areas of supervision.   Her supervisor's admonition that there would be "hell to pay" if Root and Korduner weren't reined in was coming to fruition.

118.

This functional demotion through the removal of staff was divulged to her for the first time in front of her direct subordinates (the two young, white males mentioned above), but it was obvious that her staff knew about it before she did.

119.

In this proposed re-organization, no manager in PI other than **MICHELLE BARNETT** had staff removed from their supervision and to this day, this re-organization has still not been approved. Thus, its only purpose was to humiliate and retaliate against **MICHELLE BARNETT** by functionally demoting her.

120.

This was very humiliating and upsetting to **MICHELLE BARNETT**. She was sick and, for the first time in her life, actually had suicidal thoughts upon returning home that day as she was driving along River Road headed toward the Sunshine Bridge (away from her home) and she called in sick for the following two days.

121.

On July 8, 2015, **MICHELLE BARNETT** went to see her physician who, after asking very probing personal questions, determined that the hostile and abusive work environment could not be tolerated any longer and he recommended that she be placed on immediate family medical leave (FML) for her mental and physical health.

122.

**MICHELLE BARNETT** remained on mental health leave until July 27, 2015 and was the second person in two years who was forced to take mental health leave because of the actions of

35

Korduner and Root.   Later that year, the number increased to three older females as Defendant LDH refused to do anything to remedy the unlawful conduct directed at older female staff.   Only after an older female staff member was carried out of the building by Emergency Medical Services and brought to the hospital via ambulance because of the stress of the hostile work environment, did LDH decide to finally do something (removed Korduner from PI and unbelievably placed him as legal counsel to the LDH Human Resources department).

123.

**MICHELLE BARNETT** could not file an internal grievance with LDH HR because it was their very actions that caused an acceleration in the discrimination, retaliation, mistreatment, and harassment to which she was subjected.

124.

Confident that they could continue with their discriminatory, abusive, harassing, and retaliatory mistreatment of **MICHELLE BARNETT** without any consequences from LDH, Korduner and Root continued with such treatment even after her return from FML with the following three instances (presented in chronological order over only one month's time).

125.

August 2015, Incident One: In **MICHELLE BARNETT's** role as supervisor of the PI Analytics, Compliance, and Managed Care Oversight unit, she properly completed annual evaluations on all of her staff in a timely manner.   On August 7, 2015, she was called into a meeting with Root, Korduner, and O'Connor to discuss her annual evaluation of an employee who reported directly to her (hereafter referred to as "Employee A").   In this evaluation, she rated Employee A as "Needs Improvement/Unsuccessful" based on three factors, including

36

insubordination and disrespectful treatment of older and/or black female staff of the Program

Integrity unit.   During this meeting, Korduner and Root repeatedly attacked **MICHELLE**

**BARNETT** because Employee A was another young, white male employee that was to be

protected.   Korduner and Root were only interested in intimidating her so that she would change

the evaluation of Employee A. Once Korduner realized that she was standing by her evaluation of

Employee A despite his and Root's efforts, Korduner began threatening her by stating that there

could be consequences against her over her evaluation of the employee.

126.

August 2015, Incident Two: Defendant LDH's decision to allow **MICHELLE**

**BARNETT** and other older females in PI to be subjected to discrimination became all too clear on

Wednesday, August 12, 2015 when O'Connor came to her cube and showed her a statement on his

annual planning form.   This planning form was completed by Korduner, O'Connor's supervisor,

and included what he expected of O'Connor in the coming year.   Under the "People

Development" section, Korduner wrote:

"… prepare young staff for advancement…"

but did not include any similar language for older employees.   This order furthered Korduner's

focus and hiring decisions from the previous year which favored younger employees outside the

protected class over older employees within the protected class.   Now it became apparent that

Korduner expected other supervisors to follow his lead on this issue. O'Connor changed the

statement on his own.   The revised statement "Effectively manage succession planning to ensure

junior staff are positioned for advancement and vacant positions can be easily filled" sounds less

blatantly discriminatory but belies the true nature of the situation in PI since Korduner was

predominantly hiring younger individuals.

127.

This discriminatory conduct was further evidenced by multiple statements made to **MICHELLE BARNETT** during the previous year including, but not limited to the following:

a. 10/10/14: Following a Friday morning PI Manager's Meeting in Korduner's office, once other managers were done reporting and left, O'Connor and **MICHELLE BARNETT** remained with Korduner.   Korduner talked about the average age of the women at Molina, a LDH contractor, being "what 60?" and how they therefore would not be able to learn new skills.

b. 03/30/15: In a conversation with Korduner regarding hiring someone to replace one of her staff members who had turned in her resignation that day, Korduner stated there wasn't a rush.   **MICHELLE BARNETT** told him that she really needed to post the position as soon as possible to which Korduner replied that, Gale had retired way back in February and Deanie hadn't filled her spot yet.   **MICHELLE BARNETT** asked him how that could be possible – his answer -"Gale was nothing but a paper weight." (Gale was an older female who retired from PI in February 2015.) He also spoke of another female (African-American) in these same demeaning terms shortly thereafter.

c. 04/30/15: During a conversation in her cubicle, Root stated that he was going to be recommending a re-organization soon, they were going to ask the older workers (all of whom are female) to start learning new skills, and that his expectation was that they wouldn't be able to learn new skills or would leave because they didn't want to, and

38

that she, **MICHELLE BARNETT,** would then have those permanent positions for her

new Predictive Analytics (PA) project.

128.

August 2015, Incident Three: (related to Incident One) Once **MICHELLE BARNETT**

spoke with LDH HR regarding documentation to support an unsuccessful annual evaluation rating

of Employee A, she proceeded to obtain written testimony from the women that he directed

disrespectful treatment towards.   She gathered documentation to justify the rating because of the

open hostility and contempt to which she was subjected by Root and Korduner for giving

Employee A the rating in the first place.   In total, she had forty (40) pages of documentation

confirming Employee A's behavior and her attempts at remediation.   After she consulted with

LDH HR, LDH HR representatives stated to **MICHELLE BARNETT** and to her supervisor that

she had more than enough documentation to justify the Needs Improvement/Unsuccessful rating.

At that time, **MICHELLE BARNETT** asked about the role that Root and Korduner had in this

process and she was told that they had no role since she was the evaluating supervisor and

O'Connor was the second level evaluating supervisor. **MICHELLE BARNETT** procured

O'Connor's signature on the evaluation. She then met with Employee A on Monday, August 24,

2015 at 1:00 p.m. in Room 582 of the LDH Bienville Building for the evaluation.   Employee A

stormed out of the room at 1:04 p.m. preventing her from completing the evaluation process or

explaining herself.   **MICHELLE BARNETT** was taken aback by Employee A's behavior and

thought it might be prudent to work from home the following day, if for nothing else, then to give

Employee A an opportunity to settle down. She sent her supervisor, O'Connor, an email about this

later on the evening of 8/24/15. The next morning at approximately 6:18 a.m., Mr. O'Connor

39

wrote "I think you should go to work." Later he wrote again "If you don't go in to work, you will have to take leave time." **MICHELLE BARNETT** was never sent such an email from Mr. O'Connor before about working from home. She was stunned by this email from Mr. O'Connor and immediately asked him if her work at home privileges had been changed.   Mr. O'Connor stated that they had and she no longer could work from home.   She discovered the next day on August 26, 2015 that O'Connor's work from home privileges were also taken away. No other staff members' work at home privileges were changed, altered, or removed other than **MICHELLE BARNETT's** and her supervisor, O'Connor. These work at home privileges were removed from them by John Korduner the day after she went through with her negative evaluation of Employee A – a young white male - and both she and Mr. O'Connor signed the evaluation in agreement.

129.

Korduner's open disrespect, contempt for, and discrimination against older women in the department is evident in both his language and his actions.

130.

**MICHELLE BARNETT** has suffered the brunt of this mistreatment because she is an older woman who has spoken out and continues to speak out against this discrimination, retaliation, mistreatment, and harassment on behalf of herself and other similarly mistreated women, refuses to fold under the bullying, and has no choice but to continue to bring these facts to light for as long as it takes.   This blatantly discriminatory mindset is pervasive within PI and clouds all personnel decisions within PI resulting in devastatingly low morale among those PI staff members in the protected but not in the "favored" classes.

40

131.

Multiple PI staff have attempted to alert PI management and LDH HR to the problems that this discriminatory and retaliatory mindset (in favor of young white individuals against older females) has caused and continues to cause.   However, on every occasion, the warnings and complaints have been ignored, dismissed, and/or explained away.

132.

The last three harrowing incidents all happened within one month after **MICHELLE BARNETT** returned from FML due to the discrimination, retaliation, mistreatment, and harassment to which Defendant LDH had previously subjected her confirming that nothing had changed, that this unlawful conduct would continue, and that Defendant LDH was more interested in covering it up than stopping it.

133.

Subsequently in Fall 2015, the negative evaluation **MICHELLE BARNETT** had properly given to Employee A was astoundingly reversed by LDH HR with no logical explanation.   During the review of the evaluation, Korduner initiated his own investigation via a formal grievance. This move is explicitly against LDH policy which makes it clear that the grievance process cannot be used in the evaluation review process.   This action was an attempt by Korduner to intimidate **MICHELLE BARNETT** and further illustrated the difference in how Defendant LDH favored younger males while mistreating older women.

134.

**MICHELLE BARNETT**'s supervisor was harshly interrogated twice by both Korduner and Root and when he tried to report this illegal behavior of using the grievance process during the

evaluation review process to LDH HR, they did nothing.

135.

In summary, when females including, but not limited to **MICHELLE BARNETT**, complain of and attempt to report instances of discrimination, harassment, abuse, mistreatment, retaliation, or hostile work environments, their concerns are simply ignored by LDH and the females in most cases were subjected to and made to suffer retaliation while the males about whom they complained were protected at all costs.

136.

Also, throughout the time that **MICHELLE BARNETT** worked for Defendant LDH, there has been a pattern and practice of discrimination against females evidenced in part by the promotions, raises given to, and/or hiring of white male employees over females such as **MICHELLE BARNETT** even in situations in which the females are as qualified or more qualified than the males who were promoted, given raises, and/or hired.   This pattern and practice continues to this day.

137.

Similarly, throughout the time that she has worked for Defendant LDH, there has been a pattern and practice of discrimination against older employees, mostly females evidenced in part by the promotions, raises given to, and/or hiring of younger employees under the age of 40 instead of employees over the age of 40, including **MICHELLE BARNETT**, who are as qualified or more qualified than the males who were promoted, given raises, and/or hired.   This pattern and practice continues to this day.

138.

Thus, the prevalent culture within LDH encourages discrimination in many forms because it allows managers to base hiring, pay, and promotion decisions on personal biases and improper factors or considerations such as age and gender.   This culture is completely devoid of any considerations of qualifications, tenure, experience, supervision, education, or other law factors.

139.

One such example of this discriminatory culture is the repeated promotions of and significant raises given to Hardy.   In fact, the raises that Defendant LDH gave to him increased his salary from approximately $43,000 to approximately $81,000 from 2010 to 2013 at a time when state worker salaries were supposedly frozen due to budget cuts.   In this same period of time, **MICHELLE BARNETT** received no promotions and **one** department-ordered 4% salary increase.

140.

Another such example occurred when Hardy filled two vacant positions in his OBH unit in 2013.   In order to fill these positions, he interviewed Michael Carrone, a young white male, and Kolynda Parker, an older black female.   The two positions were Program Manager 1A and Program Monitor.   The manager position was at a higher level and paid more. Hardy planned to offer Carrone the manager position and Parker the monitor position even though Carrone had only a Bachelor of English degree and little health care or technical experience while Parker had fifteen years of such experience, had supervised large staffs, and had a Master's degree,   **MICHELLE BARNETT** advised Hardy that there was no way he could justify these hires   because it was obvious discrimination, but he did it anyway and even tried to intimidate Ms. Parker by stating,

43

that he "had the power to get anyone fired."

141.

Soon after, Michael Carrone was promoted to Program Manager 2 (PM2) of OBH

Business Intelligence/IT to replace Hardy over more qualified and older applicants within the unit

including Annette Giroir and Kolynda Parker.   Ms. Giroir, who like Ms. Parker had a Master's

degree and many years of experience in healthcare, is an older female employee.   Both Ms. Giroir

and Ms. Parker were already working in the section that this PM2 was to supervise.   Moreover,

Ms. Giroir was passed over twice for the position, once denied in favor of Hardy and once denied

in favor of Carrone (both young white males) even though she had been working in the section for

over five (5) years.   Upon information and belief, Carrone was not even vetted for minimum

qualifications by anyone in LDH OBH, and no candidate interviews were conducted before he was

promoted.   Additionally, Ms. Giroir has received no promotions and no raises for at least five

years.

142.

At this same time and to underscore how insidiously rampant the discrimination is

throughout the entire LDH agency, Michael Carrone was also offered a Program Manager 2

position in OPH (above unit in Paragraph 141 above was OBH) in a technical area working with

data.   Once again, he was offered this promotion over Ms. Parker and Carrone even had the luxury

of choosing which position he wanted, the OBH or the OPH position.   He chose the OBH position

in Paragraph 141 above but OPH did not subsequently extend the offer to the most qualified

applicant, Ms. Parker.   Instead they offered her a position two levels lower as a Program Manager

1A.   Later, OPH offered the PM2 position to another young, white male from outside of LDH, Jay

Besse who also had much less work and supervisory experience than Ms. Parker.

143.

Most recently in March 2016, Carrone was promoted to the PM4 Section Chief position in LDH OBH IT/BI section that was denied to **MICHELLE BARNETT** on ten separate occasions even though she was much more highly qualified than Carrone and in fact, was the most qualified person who applied for the position.

144.

In summary, during the first two years of his tenure at LDH, Carrone was promoted twice while **MICHELLE BARNETT** has not been promoted at all in her six and a half years in LDH despite applying over 100 times for promotional opportunities nor has Ms. Giroir been promoted over the past five years.

145.

When the same two positions from Paragraph 140 above were being filled again (manager and monitor) in OBH, two internal applicants were interested in moving to the area. The first such applicant was Chris McCurnin, a young, white male with no experience in the section (most of his experience was ad hoc policy) and the second was Jing Liu, an older female, who was already working in the section and had a very relevant Master's degree in Statistics.   In following its pattern and practice of discrimination, Defendant LDH offered McCurnin the higher position and Liu the lower position even though Ms. Liu had better educational and experience qualifications than Mr. McCurnin.

146.

Upon information and belief, another example occurred when Defendant LDH attempted

45

to promote Richard Pierce, a young white male, to Program Manager 2 in the Program Integrity Provider Enrollment (PI PE) unit.    This move would have denied a promotion to the current manager of the PI PE unit, Kelly McNabb, who as an older female is currently undergoing similar harassment, discrimination, and retaliation in what she believes is an attempt to terminate her 30-year employment with the state to make room for Pierce.    In the end, it was determined that Mr. Pierce did not even meet the minimum requirements for the job, yet once again, the job was not offered to the most qualified person, Ms. McNabb.

147.

Another example occurred when John Korduner, a young, white male under the age of 40 who had only one year of healthcare experience in LDH was promoted to Program Manager 4 PI Section Chief ahead of his own supervisor in Legal, an older female with many years of healthcare experience at LDH.    Upon information and belief, Korduner was not even minimally qualified for the position by supervisory requirements but an exception was made for him.    The two rejected applicants that were interviewed were over the age of 60.

148.

Likewise, Joseph Foxhood, a white male, was promoted to Program Manager 4 over **MICHELLE BARNETT.**    She is more highly educated (Master's degree, he has no graduate degree) and experienced than Mr. Foxhood.    Moreover, at the time of his promotion, also upon information and belief, Mr. Foxhood was not an employee of LDH (only a contractor), and had professional level experience (defined by La. Civil Service as post-baccalaureate) of only three years.    The minimum qualifications for the job required five years professional level experience. **MICHELLE BARNETT** had 25; Foxhood had three (thus he did not even meet the minimum).

46

Additionally, Mr. Foxhood was the supervisor responsible for the discriminatory behavior in Paragraph 142 above with Carrone and Besse illustrating that the beneficiaries of the discrimination continue with their own discriminatory practices in the staff they hire, thus creating a vicious, never-ending cycle.   Sadly, this PM4 position into which Defendant LDH promoted Foxhood over **MICHELLE BARNETT** was in OPH; therefore **MICHELLE BARNETT** was a victim of discrimination across all four of the six agencies in LDH (OBH, Medicaid, OS, OPH) in which she worked.

149.

Subsequently, Foxhood hired an external employee, Jay Besse, a young male, to a Program Manager 2 position over Ms. Parker.   At the time, Ms. Parker was a Program Manager 1 who had been working for Foxhood for over a year.   She was much more highly qualified (two Bachelor's degrees, a Master's degree and healthcare certification with over fifteen years of experience) than Besse (no graduate degree and five years of work experience) and as a black female was denied promotion once again as she had been when she was passed over for Michael Carrone in OBH. Eventually, Ms. Parker complained and put her experience of discrimination in writing to her supervisors, to no avail.

150.

Further, Besse was hired at the same level as **MICHELLE BARNETT** when she was hired (PM2) even though he only had a Bachelor's degree and five-years work experience while **MICHELLE BARNETT** had a Bachelor's degree, a Master's degree and certification as a SAS Advanced Programmer with 23-years of experience when she started working at LDH.   Yet Besse received a 42% increase in pay from his previous job and started at $85,000 annual salary;

**MICHELLE BARNETT** received a 23% increase in pay from her previous job and started at $80,000 annual salary.

151.

Another example of this systemic discrimination occurred when Hardy, a young, white male was promoted to PM4 in Medicaid over highly qualified older employees including Tim Williams, an older black male and multiple PhD level employees.

152.

Likewise, Jode Burkett, a young, white male, was promoted to PM2 over a highly educated and experienced older black male, Ron Johnson.   Mr. Johnson was believed to be the natural person to be promoted to this PM2 position because he was the most knowledgeable and senior staff member in the unit and was highly educated with two Masters degrees while Burkett only had a single Bachelor's degree.

153.

Additionally, Mr. Burkett received multiple significant pay raises throughout the previous five years in LDH at a time when state worker salaries were supposedly frozen due to budget cuts. In contrast, **MICHELLE BARNETT** received no promotions and **one** department-ordered 4% salary increase during this same period of time.

154.

Likewise, Tyler Carruth, a young white male, was promoted to Program Manager 4 _multiple times_ _in multiple sections_ (Office of Public Health, Medicaid, Office of the Secretary) over older and more qualified applicants, including **MICHELLE BARNETT**.   The first such promotion occurred when an older female was unceremoniously and humiliatingly removed from

48

her PM4 position to make way for Mr. Carruth even though he had no experience in her section. She soon retired after the move.

155.

Additionally, Mr. Carruth received multiple promotions and significant pay raises throughout the previous five years in LDH at a time when state worker salaries were supposedly frozen due to budget cuts. In contrast, **MICHELLE BARNETT** received no promotions and **one** department-ordered 4% salary increase during this same period of time.

156.

Similarly, Defendant LDH attempted to promote Kevin Guillory, a young, white male temporary employee into a permanent position in Program Integrity while there were many older, more highly qualified females in the section who were in temporary positions desperately waiting for a permanent position to open up.   Mr. Guillory had a General Studies Bachelor's degree, worked short stints in Louisiana Workforce Commission and Division of Administrative Law, and had been in LDH for a very short time working in a clerical capacity when he was being pushed for this promotion.   In contrast, the women who would have been excluded from this position were ten-year employees, one with a nursing degree and a medical coding certification, the other with a master's degree and clinical experience as a social worker – both extremely relevant in healthcare.

157.

Also, upon information and belief, Defendant LDH promoted Ryan Bilbo, a young, white male to Program Manager 2 over older employees who had at least as much experience as he had.

158.

Additionally, Mr. Bilbo received multiple promotions and significant pay raises in only

three years' time in LDH at a time when state worker salaries were supposedly frozen due to budget cuts. In this same period of time, **MICHELLE BARNETT** received no promotions and **one** department-ordered 4% salary increase.

159.

Likewise, Timothy White, a young, white male received Optional Pay Adjustments (OPA) with significant salary increases.   Defendant LDH repeatedly gave Mr. White these salary adjustments despite the existence of rules which limit the frequency of these adjustments to a single individual.

160.

In contrast, Defendant LDH ignored **MICHELLE BARNETT'S** request for an OPA.

161.

During the same time, upper management of LDH technical areas was consistently staffed with very high-salaried young, white males including Zachary Jiwa, Lucas Tramontozzi, Chris Dykes, Jeremy Deal, Tyler Carruth to name a few.

162.

Similarly, George Bucher, a white male, was hired to work for **MICHELLE BARNETT** in Program Integrity without her input.   More importantly, even though she was his supervisor, had more experience and education (Master's degree vs a Bachelor's degree), Mr. Bucher was brought in making approximately $15,000 or 18% more than she made.   When she tried to address this disparity with a request for promotion or Optional Pay Adjustment, she was ignored.

163.

Additionally, Mr. Bucher received multiple promotions and significant pay raises

50

throughout the previous five years of his employment with LDH at a time when state worker

salaries were supposedly frozen due to budget cuts. In contrast, during this same period of time

**MICHELLE BARNETT** received no promotions and **one** department-ordered 4% salary.

164.

Based on a salary study performed on LDH salaries through calendar year 2013

specifically in the area of information technology, female salaries lag far behind their male

counterparts.   When studying how females fare through time regarding their individual salary

increases, females again fare worse than males.

165.

Upon information and belief, males have received well over twice the yearly compensation

raises that females have received.   This is a measure of the trend that males are promoted more

frequently than females (more upward mobility), that their pay increases when promoted are

larger, and that the base salary from which they are receiving raises is larger.

166.

Since the filing of her original EEOC Charge of Discrimination in December 2015,

Defendant LDH has continued to retaliate against **MICHELLE BARNETT** and discriminate

against her based upon her gender/sex and/or her age.   One such act of retaliation and

discrimination involved the eventual filling of the PM4 Position (that she first began being

discriminated against four years previously in 2012) in or about February 2016.

167.

Defendant LDH deceptively responded to **MICHELLE BARNETT's** EEOC Charge by

claiming that it had not discriminated against her because someone other than Hardy filled the

PM4 Position.

168.

However, Defendant LDH only confirmed her claims of discrimination and its pattern of discrimination by promoting Carrone, another young, (under 35 years of age) white male with little experience and little relevant education, into the position – Bachelor's degree in English (this position is **Section Chief of the IT/Business Intelligence** section and has always required applicants with technical experience/education), MBA (again no technical education), one year supervisory experience, only two years' experience in technical area.

169.

Mr. Carrone was placed into this position even though **MICHELLE BARNETT** again applied for it and was far more qualified to fill it than Mr. Carrone.

170.

In doing so, Defendant LDH promoted Carrone twice during the first two years of his tenure at LDH while **MICHELLE BARNETT** has never been promoted at all in over six years in LDH despite applying over 100 times for promotional opportunities.

171.

In addition, Defendant LDH passed over a black female with a doctorate degree and many more years of experience when it promoted Carrone to the PM4 Position. She immediately resigned her employment and left LDH due to this discriminatory treatment.

172.

Additionally, since **MICHELLE BARNETT** first complained to LDH of discrimination, LDH has retaliated against her and/or continued to discriminate against her by denying her dozens

52

of promotions.    She is currently classified as a PM2, at LDH while in this position, she applied for other positions including, but not limited to the following:

    -the original LDH OBH PM4, Section Chief of Business Intelligence – over ten (10) applications from 2012 through 2016

    -LDH Office of the Secretary PM3, (IT)

    -LDH OBH Deputy Assistant Secretary – approximately February 2013 and August 2014

    -LDH OPH PM4 – approximately July 2014

    -LDH Deputy Undersecretary 3 – approximately May 2015

    -LDH Medicaid Deputy Director – approximately June 2015

    -LDH Medicaid PM4 – approximately January 2016

    - LDH Medicaid PM4 – approximately April 2016

    -LDH Medicaid Deputy Director – approximately April 2016

    -LDH Medicaid PM4 – approximately April 2016

    -LDH Deputy Undersecretary 3 – approximately April 2016

    -LDH Medicaid PM4 – approximately June 2016 *

    -LDH Medicaid Deputy Director – approximately June 2016

    -LDH Medicaid PM4 – approximately July 2016

    -LDH Medicaid PM4 – approximately July 2016 *

    -LDH Medicaid PM4 – approximately August 2016

    -LDH Medicaid PM4 – approximately August 2016 *

    -OBH PM3 – approximately September 2016

    -LDH Medicaid Deputy Director – approximately October 2016

-LDH Medicaid PM4 – approximately January 2017

-LDH Medicaid PM4 – approximately February 2017

-LDH Medicaid PM4 – approximately April 2017

-LDH Medicaid PM4 – approximately April 2017 *

-LDH Medicaid Deputy Director – approximately April 2017

-LDH Medicaid PM2 – approximately September 2017 **

173.

As to each and every one of these positions, she was deemed minimally qualified by SCS rules and upon information and belief was at least and, in most cases, more qualified than the person that was eventually hired.

174.

Most importantly, **MICHELLE BARNETT** has applied for the PM4 Position (for which she was first discriminated against) each of the ten times it has been posted over the past 5+ years.

175.

Defendant LDH repeatedly left the PM4 Position vacant until the last posting in early 2016.

176.

At that time, it changed the requirements for the position to include "This vacancy is being announced as a Promotional Appointment and will be filled by a **classified employee with permanent status within LDH/Office of Behavioral Health**." This was an entirely artificial requirement as the previous nine postings did not require this and it was included to specifically disqualify **MICHELLE BARNETT** from eligibility because she was no longer in OBH.

177.

As proof of the artificiality of the requirement, LDH-OBH just posted the original PM4 Position again in December 2017 for the 11th time after Carrone left LDH after a little over a year in the PM4 Position for which he was woefully incapable of performing. This artificial requirement has been removed from the 11th posting.

178.

At all times **MICHELLE BARNETT** was more highly qualified than the young white male that was placed into the position (Carrone) or the young white male who it was promised to originally (Hardy). Additionally, this eligibility criterion was taken away from **MICHELLE BARNETT** by LDH itself when they demoted her.

179.

The postings identified by * represent openings for the Section Chief of Program Integrity (PI). **MICHELLE BARNETT** applied for each of these as a member of the unit (and was vigorously encouraged by most of the PI staff to apply since she had proven herself a highly qualified leader in a short period of time), but was <u>denied even an interview every time</u>.   In contrast, three males from outside of Program Integrity were hired into the position from January 2016 to May 2017.

180.

**MICHELLE BARNETT** was not even for any of these positions interviewed.   However, upon information and belief multiple young males who had vastly less experience and relevant education qualifications than she had were interviewed and possibly were hired to fill these positions.   One such less-qualified young male was a former subordinate of **MICHELLE**

55

**BARNETT** and he was interviewed while she was not.

181.

Unfortunately, the systemic gender/sex and/or age discrimination that Defendant LDH

subjected worsened and essentially resulted in her being blackballed throughout all of LDH.    The

evidence of this blackballing includes, but is not limited to the following specific instances.

182.

First, four years after **MICHELLE BARNETT** first began complaining of discriminatory

and retaliatory treatment, Defendant LDH finally undertook an internal investigation in 2016 to

determine the veracity of her claims and spoke with numerous women in her PI unit who told

**MICHELLE BARNETT** that they confirmed to the investigator that gender and age

discrimination were rampant within LDH and many included their own experiences with this

discrimination.

183.

On August 3, 2016, **MICHELLE BARNETT'S** supervisor was called in for the same

questioning by staff members in the LDH Legal Department.    From that date on, **MICHELLE

BARNETT'S** supervisor rarely spoke with her.

184.

In addition, with the hiring of a new PI Section Chief in August 2016, neither the Section

Chief nor her supervisor would ever meet with her alone.    At times when she asked to discuss

something with her supervisor, she was told that he would be in the office (he worked across town)

later in the afternoon to meet with her and the Section Chief; he would not even speak over the

phone to her. The only time she spoke with him over many months was during her annual

evaluation. This was very difficult for **MICHELLE BARNETT** because up to this point, she and

her supervisor, Quint O'Connor, had an excellent relationship.

185.

Upon information and belief, someone in LDH used the fact that she had sued LDH to

blackball her.

186.

Also upon information and belief, her supervisor, Mr. O'Connor, was forced into this

behavior because during the annual evaluation this year, he gave her the highest score possible for

a state employee.

187.

Second, the job posting above identified by ** represents an opening that **MICHELLE**

**BARNETT** was approached and encouraged to apply for by a former co-worker. This would have

been a lateral move rather than a promotion.

188.

This co-worker was asked by the Section Chief for recommendations of qualified names

that could fill the spot because they did not have anyone and were worried about filling it with a

qualified applicant. This co-worker told the Section Chief about **MICHELLE BARNETT**. After

speaking with the Section Chief and also being encouraged to apply by her, **MS. BARNETT**

applied and thought maybe for the first time she would be given a chance. However, soon

thereafter she was told by her former co-worker that she (the co-worker) had been mysteriously

removed from all input and communications regarding the position. She was apologetic to **MS.**

**BARNETT** and told her that she just didn't understand what had happened, why they were not

57

moving on the interviews, and why she was cut out, despite the glowing praise she had given her Section Chief regarding **MICHELLE BARNETT.**

189.

**MICHELLE BARNETT**'s suspicions of blackballing were confirmed in October 2017 when the new Section Chief of Program Integrity told her that when he first began working at LDH (May 2017) he was told by LDH Human Resources officials to beware of **MICHELLE BARNETT**, "she is trouble", "she is a problem employee", "she will sue you", "she will file appeals against you", "she will file grievances against you". This was devastating to hear for **MICHELLE BARNETT**. She suspected this type of blackballing was the case but to hear someone actually say it was more than she could bear. She realized at this point that she never had a chance and that the retaliation extended to blackballing her with people who had never even met her.

190.

It was at this point that MICHELLE BARNETT made the difficult and painful decision that she would have to leave the area of healthcare and her employment with Defendant LDH because it was the only way to escape the hostile work environment, blackballing, discrimination, retaliation, mistreatment, and harassment that were systemic and entrenched in Defendant LDH.

191.

By that time, **MICHELLE BARNETT** had worked in healthcare for ten years and she had hoped to spend the remainder of her career in this area.   However, any public or private sector health jobs in Louisiana were under the complete purview and control of Defendant LDH; therefore she had no choice. This was very upsetting to **MICHELLE BARNETT** and she is

devastated that she is being forced to do this to save her physical, emotional, and mental health. She is basically having to "start over" at the age of 51 in a new sector of the economy (disaster management) where she has little experience.

192.

Since MICHELLE BARNETT was forced to leave her employment with Defendant LDH, the state of Louisiana has finally recognized and acknowledged this culture of discrimination through the appointment of a task force by the Governor to investigate and propose ways to prevent further discrimination.

193.

In summary, Defendant LDH has continuously subjected **MICHELLE BARNETT** to discrimination, retaliation, mistreatment, and harassment for more than five years since she first complained of discrimination at LDH.

194.

**MICHELLE BARNETT** asserts that Defendant LDH treated her differently and constructively discharged her because of her gender/sex and/or because of her age and that the reasons given for the actions taken against her were pretextual.

195.

**MICHELLE BARNETT** timely filed a Charge of Discrimination against LDH with the U.S. Equal Employment Opportunity Commission through its New Orleans field office on or about December 29, 2015.   A copy of the foregoing charge is attached hereto as Exhibit "A".

196.

She subsequently filed an Amended Charge of Discrimination against LDH with the U.S.

Equal Employment Opportunity Commission through its New Orleans field office on or about June 21, 2016.   A copy of the foregoing Amended Charge is attached hereto as Exhibit "B".

197.

On or about September 26, 2017, the EEOC placed in the mail a Notice of Right to Sue letter entitling **MICHELLE BARNETT** to file a civil action against Defendant LDH within 90 days of her receipt of said notice.   A copy of the Notice of Right to Sue letter is attached hereto as Exhibit "C".

198.

**MICHELLE BARNETT** has met and satisfied all procedural and administrative remedies precedent to the commencement of this lawsuit.

## CAUSES OF ACTION

## TITLE VII CAUSE OF ACTION

199.

**MICHELLE BARNETT** incorporates by reference each of the allegations set forth in Paragraphs 1-198 above, as if fully set forth herein.

200.

Defendant LDH discriminated against **MICHELLE BARNETT** based upon her gender/sex with regard to its treatment of her in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000, *et seq.*, as amended since it treated similarly situated male employees differently than it treated her and/or its actions had a disparate impact on **MICHELLE BARNETT** as a female employee entitled to protections under Title VII.

60

201.

Thus, Defendant LDH intentionally discriminated against **MICHELLE BARNETT**

and/or Defendant LDH's conduct had a disparate impact on **MICHELLE BARNETT** in violation

of Title VII.

202.

The effect of the practices complained of herein has been to unlawfully deprive

**MICHELLE BARNETT** of equal employment opportunities by denying her employment and/or

employment opportunities because of her gender/sex.

203.

Defendant LDH's conduct was so severe, continuous and pervasive that it created a hostile

work environment and **MICHELLE BARNETT** was forced to leave her employment with

Defendant LDH and this separation constituted a constructive discharge.

204.

As a direct result of Defendant LDH's discriminatory conduct, **MICHELLE BARNETT**

has sustained, is entitled to recover and seeks to recover all general damages, compensatory

damages, actual damages, liquidated damages, punitive damages, and lost wages that she proves

and is entitled to recover pursuant to Title VII.

205.

Additionally, due to Defendant LDH's discriminatory conduct, **MICHELLE BARNETT**

is entitled to recover and seeks to recover her reasonable attorney's fees and costs incurred in this

matter pursuant federal law including, but not limited to, 29 U.S.C. §§ 216(b) and 626(b).

## ADEA CAUSE OF ACTION

206.

**MICHELLE BARNETT** incorporates by reference each of the allegations set forth in Paragraphs 1-198 above, as if fully set forth herein.

207.

Defendant LDH discriminated against **MICHELLE BARNETT** based upon her age with regard to its treatment of her in violation of 29 U.S.C. § 621, *et seq*., as amended (the Age Discrimination in Employment Act) since it treated similarly situated younger employees differently than it treated her and/or its actions had a disparate impact on **MICHELLE BARNETT** as an older employee entitled to protections under the Age Discrimination in Employment Act.

208.

Thus, Defendant LDH intentionally discriminated against **MICHELLE BARNETT** and/or Defendant LDH'S conduct had a disparate impact on **MICHELLE BARNETT** in violation of the Age Discrimination in Employment Act.

209.

The effect of the practices complained of herein has been to unlawfully deprive **MICHELLE BARNETT** of equal employment opportunities by denying her employment and/or employment opportunities because of her age.

210.

Defendant LDH's conduct was so severe, continuous and pervasive that it created a hostile work environment and **MICHELLE BARNETT** was forced to leave her employment with

Defendant LDH and this separation constituted a constructive discharge.

211.

As a direct result of Defendant LDH'S discriminatory conduct, **MICHELLE BARNETT** has sustained, is entitled to recover and seeks to recover all general damages, compensatory damages, actual damages, liquidated damages, punitive damages, and lost wages that she proves and is entitled to recover pursuant to the Age Discrimination in Employment Act.

212.

Additionally, due to Defendant LDH'S discriminatory conduct, **MICHELLE BARNETT** is entitled to recover and seeks to recover her reasonable attorney's fees and costs incurred in this matter pursuant federal law including, but not limited to, 29 U.S.C. §§ 216(b) and 626(b).

## LHRA AGE CAUSE OF ACTION

213.

**MICHELLE BARNETT** incorporates by reference each of the allegations set forth in Paragraphs 1-198 above, as if fully set forth herein.

214.

Defendant LDH discriminated against **MICHELLE BARNETT** based upon her age with regard to its treatment of her in violation of La. R.S. 51:2231, *et seq.*, as amended since it treated similarly situated younger employees differently than it treated her and/or its actions had a disparate impact on **MICHELLE BARNETT** as an older employee entitled to protections under La. R.S. 51:2231, *et seq.*

215.

Thus, Defendant LDH intentionally discriminated against **MICHELLE BARNETT**

and/or Defendant LDH'S conduct had a disparate impact on **MICHELLE BARNETT** in violation of La. R.S. 51:2231, *et seq*.

216.

The effect of the practices complained of herein has been to unlawfully deprive **MICHELLE BARNETT** of equal employment opportunities by denying her employment and/or employment opportunities because of her age.

217.

Defendant LDH's conduct was so severe, continuous and pervasive that it created a hostile work environment and **MICHELLE BARNETT** was forced to leave her employment with Defendant LDH and this separation constituted a constructive discharge.

218.

As a direct result of Defendant LDH'S discriminatory conduct, **MICHELLE BARNETT** has sustained, is entitled to recover and seeks to recover all general damages, compensatory damages, actual damages, liquidated damages, punitive damages, and lost wages that she proves and is entitled to recover pursuant to La. R.S. 51:2231, *et seq*.

219.

Additionally, due to Defendant LDH'S discriminatory conduct, **MICHELLE BARNETT** seeks to recover all attorney's fees and costs to which she is entitled pursuant to La. R.S. 51:2231, *et seq*.

## LHRA GENDER/SEX CAUSE OF ACTION

220.

**MICHELLE BARNETT** incorporates by reference each of the allegations set forth in

64

Paragraphs 1-198 above, as if fully set forth herein.

221.

Defendant LDH discriminated against **MICHELLE BARNETT** based upon her gnder/sex with regard to its treatment of her in violation of La. R.S. 51:2231, *et seq*., as amended since it treated similarly situated male employees differently than it treated her and/or its actions had a disparate impact on **MICHELLE BARNETT** as a female employee entitled to protections under La. R.S. 51:2231, *et seq.*

222.

Thus, Defendant LDH intentionally discriminated against **MICHELLE BARNETT** and/or Defendant LDH'S conduct had a disparate impact on **MICHELLE BARNETT** in violation of La. R.S. 51:2231, *et seq.*

223.

The effect of the practices complained of herein has been to unlawfully deprive **MICHELLE BARNETT** of equal employment opportunities by denying her employment and/or employment opportunities because of her gender/sex.

224.

Defendant LDH's conduct was so severe, continuous and pervasive that it created a hostile work environment and **MICHELLE BARNETT** was forced to leave her employment with Defendant LDH and this separation constituted a constructive discharge.

225.

As a direct result of Defendant LDH'S discriminatory conduct, **MICHELLE BARNETT** has sustained, is entitled to recover and seeks to recover all general damages, compensatory

65

damages, actual damages, liquidated damages, punitive damages, and lost wages that she proves and is entitled to recover pursuant to La. R.S. 51:2231, *et seq*.

226.

Additionally, due to Defendant LDH'S discriminatory conduct, **MICHELLE BARNETT** seeks to recover all attorney's fees and costs to which she is entitled pursuant to La. R.S. 51:2231, *et seq*.

## LEDA CAUSE OF ACTION

227.

**MICHELLE BARNETT** incorporates by reference each of the allegations set forth in Paragraphs 1-198 above, as if fully set forth herein.

228.

Defendant LDH discriminated against **MICHELLE BARNETT** based upon her age with regard to its treatment of her in violation of La. R.S. 23:301, *et seq*., as amended since it treated similarly situated younger employees differently than it treated her and/or its actions had a disparate impact on **MICHELLE BARNETT** as an older employee entitled to protections under La. R.S. 23:301, *et seq*.

229.

Thus, Defendant LDH intentionally discriminated against **MICHELLE BARNETT** and/or Defendant LDH'S conduct had a disparate impact on **MICHELLE BARNETT** in violation of La. R.S. 23:301, *et seq*.

230.

The effect of the practices complained of herein has been to unlawfully deprive

**MICHELLE BARNETT** of equal employment opportunities by denying her employment and/or employment opportunities because of her age.

231.

Defendant LDH's conduct was so severe, continuous and pervasive that it created a hostile work environment and **MICHELLE BARNETT** was forced to leave her employment with Defendant LDH and this separation constituted a constructive discharge.

232.

As a direct result of Defendant LHD'S discriminatory conduct, **MICHELLE BARNETT** has sustained, is entitled to recover and seeks to recover all general damages, compensatory damages, actual damages, liquidated damages, punitive damages, and lost wages that she proves and is entitled to recover pursuant to La. R.S. 23:301, *et seq.*

233.

Additionally, due to Defendant LDH'S discriminatory conduct, **MICHELLE BARNETT** seeks to recover all attorney's fees and costs to which she is entitled pursuant to La. R.S. 23:301, *et seq.*

## EQUAL PAY ACT CAUSE OF ACTION

234.

**MICHELLE BARNETT** incorporates by reference each of the allegations set forth in Paragraphs 1-198 above, as if fully set forth herein.

235.

Defendant LDH discriminated against **MICHELLE BARNETT** based upon her gender/sex with regard to its treatment of her in violation of Equal Pay Act of 1963, 29 U.S.C. §

206, *et seq*., as amended since it paid unequal wages to men and women such as **MICHELLE BARNETT** who perform jobs that require substantially equal skill, effort, and responsibility and that are performed under similar working conditions within the same establishment.

236.

Thus, Defendant LDH intentionally discriminated against **MICHELLE BARNETT** and/or Defendant LDH'S conduct had a disparate impact on **MICHELLE BARNETT** in violation of 29 U.S.C. § 206, *et seq*.

237.

The effect of the practices complained of herein has been to unlawfully deprive **MICHELLE BARNETT** of equal employment opportunities by denying her employment and/or employment opportunities because of her gender/sex.

238.

As a direct result of Defendant LDH'S discriminatory conduct, **MICHELLE BARNETT** has sustained, is entitled to recover and seeks to recover all general damages, compensatory damages, actual damages, liquidated damages, punitive damages, and lost wages that she proves and is entitled to recover pursuant to 29 U.S.C. § 206, *et seq*.

239.

Additionally, due to Defendant LDH'S discriminatory conduct, **MICHELLE BARNETT** seeks to recover all attorney's fees and costs to which she is entitled pursuant law.

## LEPAW CAUSE OF ACTION

240.

**MICHELLE BARNETT** incorporates by reference each of the allegations set forth in

68

Paragraphs 1-198 above, as if fully set forth herein.

241.

Defendant LDH discriminated against **MICHELLE BARNETT** based upon her gender/sex with regard to its treatment of her in violation of the Louisiana Equal Pay for Women Act, La. R.S. 23:661, *et seq.*, as amended since it paid unequal wages to men and women such as **MICHELLE BARNETT** who perform jobs that require substantially equal skill, effort, and responsibility and that are performed under similar working conditions within the same establishment.

242.

Thus, Defendant LDH intentionally discriminated against **MICHELLE BARNETT** and/or Defendant LDH'S conduct had a disparate impact on **MICHELLE BARNETT** in violation of La. R.S. 23:661, *et seq.*

243.

The effect of the practices complained of herein has been to unlawfully deprive **MICHELLE BARNETT** of equal employment opportunities by denying her employment and/or employment opportunities because of her gender/sex.

244.

As a direct result of Defendant LDH'S discriminatory conduct, **MICHELLE BARNETT** has sustained, is entitled to recover and seeks to recover all general damages, compensatory damages, actual damages, liquidated damages, punitive damages, and lost wages that she proves and is entitled to recover pursuant to La. R.S. 23:661, *et seq.*

245.

Additionally, due to Defendant LDH'S discriminatory conduct, **MICHELLE BARNETT** seeks to recover all attorney's fees and costs to which she is entitled pursuant law.

246.

**MICHELLE BARNETT** is entitled to and demands a jury trial on all issues and claims set forth herein.

**WHEREFORE**, Plaintiff **MICHELLE BARNETT** prays for trial by jury and, after due proceedings are had that there be judgment herein in her favor and against Defendant **LOUISIANA DEPARTMENT OF HEALTH formerly known as LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS** for all such sums as are reasonable in the premises, punitive damages as allowed by law, penalties as allowed by law, general damages, lost wages, attorney's fees, legal interest thereon from the date of judicial demand, all costs, and all such other relief afforded at law or in equity.

**RESPECTFULLY SUBMITTED:**

**KEEGAN, DeNICOLA, KIESEL, BAGWELL, JUBAN & LOWE, LLC**

 /s/David A. Lowe
David A. Lowe, LSBA No. 24529
5555 Hilton Avenue
Suite 205
Baton Rouge, Louisiana 70808
Telephone: (225) 364-3600
Facsimile: (225) 364-3608
**ATTORNEYS FOR PLAINTIFF
MICHELLE BARNETT**