# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**MICHELLE BARNETT**

**VERSUS**

**LOUISIANA DEPARTMENT
OF HEALTH**

**CIVIL ACTION**

**NO. 17-1793-JWD-RLB**

## RULING AND ORDER

This matter comes before the Court on three motions filed by Defendant Louisiana Department of Health ("LDH"): the Motion to Dismiss or, Alternatively, Stay Proceeding Pursuant to Fed. R. Civ. Proc. 12(b)(1) (Doc. 11); the Motion to Dismiss Pursuant to Fed. R. Civ. Proc. 12(b)(1) (Doc. 16); and the Motion to Dismiss Pursuant to Fed. R. Civ. Proc. 12(b)(6) (Doc. 18). Plaintiff Michelle Barnett opposes the motions. (Docs. 14, 25 & 26). LDH has filed reply briefs in support of the latter two motions. (Docs. 27 & 28). Oral argument is not necessary. After careful consideration of the parties' arguments, the facts alleged, and the applicable law, and for the following reasons, the motion to dismiss Plaintiff's claims under state law and the Age Discrimination in Employment Act ("ADEA") (Doc. 16) is granted, and these claims are dismissed without prejudice. The motion to dismiss Plaintiff's claim under the Louisiana Human Rights Act (Doc. 18) is denied as moot. Finally, the motion to dismiss under the *Colorado River* abstention doctrine (Doc. 11) is denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Allegations of the Complaint

For the purposes of a motion to dismiss, the Court must accept the following factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Lormand v. US*

*Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). On December 22, 2017, Plaintiff Michelle Barnett filed suit in this Court against LDH alleging that she was discriminated against on the basis of her age and sex during the course of her employment with LDH from 2011 to 2017. Barnett is a 51 year-old white woman. (Doc. 1 at 3). On March 1, 2012, LDH transferred her from its Medicaid division to the Office of Behavioral Health ("OBH") as a Program Manager 2 ("PM2"). (*Id.* at 4). As of the date of her transfer, Barnett had 24 years of experience in Business Intelligence/Analytics ("BI") in the fields of finance, insurance, energy, disaster management, education, information technology, and healthcare. (*Id.*). She earned a bachelor's degree in mathematics and a master's degree in applied statistics from Louisiana State University. (*Id.*). She was one of only 12 "SAS Advanced Certified Programmers" in the state of Louisiana and the only one at LDH. (*Id.*). She was accepted into the Healthcare Informatics doctoral program at Rutgers University. (*Id.*). She had staff and organizational management experience as an assistant actuary, vice president for a national corporation, chief forecaster for an energy company, president of an energy consulting company, department chair of a local college's mathematics department, and LDH's Assistant Section Chief of all physician's programs in Louisiana. (*Id.*). She also had "program management experience throughout her entire career." (*Id.* at 5).

Barnett "managed the creation and build-out of OBH's entire data warehouse, various cross walks for communication with numerous data systems and databases on a state and federal level, data dictionaries, and design specifications essentially creating the elemental foundations of all BI functions agency-wide." (Doc. 1 at 5). She also directed data collection for use in federal and state regulatory reporting, legislative requests, and other "ad hoc requests that are necessary to monitor operations agency-wide." (*Id.*). Additionally, Barnett "developed and implemented policies, protocols, and designs for system enhancements, system and database testing, data integrity, and

was the BI lead person for all OBH agency rollouts of new initiatives, problems with existing programs, or initiatives which she led." (*Id.*).

### 1. Age and Sex Discrimination

In May 2012, Barnett's supervisor, Randy Lemoine, retired and suggested that she apply for his position—Program Manager 4 ("PM4") and Section Chief of BI. (Doc. 1 at 6). Barnett applied for the position. (*Id.*). Barnett was selected as one of the top-five applicants and was interviewed for the position. (*Id.* at 6–7). The hiring committee confirmed that Barnett was qualified, having been "essentially serving in the PM4 position [and] working closely with Mr. Lemoine," and thus designated her as the top applicant for the position. (*Id.* at 7). Another applicant for the position, Joshua Hardy, was a male under the age of 35 who was not qualified for the position under LDH's criteria because he had only two years of post-baccalaureate experience and who, "upon information and belief, falsified information on his application for the PM4 Position to suggest that he possessed the minimum qualifications for the PM4 Position." (*Id.*). Lemoine's administrative assistant concluded that Hardy was not qualified and informed Lemoine that Hardy could not be included in the final cut of applicants. (*Id.*). "Lemoine responded to this fact by closing his office door and telling [his assistant] that he had no choice and he was being forced to include Hardy in the group of final applicants and to interview him for the PM4 Position." (*Id.* at 7–8).

Despite the fact that the Civil Service later "confirmed" that Hardy was not qualified, Hardy was given an "informal interview" by LDH, which Barnett alleges illustrates that OBH management "was aware that Hardy was not minimally qualified for a PM4 level position and thus was not eligible to be interviewed." (Doc. 1 at 8). However, despite the fact that Hardy was not qualified and Barnett was the most highly-qualified applicant, LDH decided to leave the PM4

position unfilled. (*Id.*). Barnett alleges that "it was apparent" that LDH decided to leave the position unfilled until Hardy could gain the minimum work experience necessary to qualify for the position. (*Id.* at 8–9). Despite the fact that she was not officially promoted, Barnett continued to unofficially perform PM4 duties and would "fill in as the Section Chief" at the request of OBH management. (*Id.* at 9).

As of 2017, Barnett had yet to be promoted at LDH, while Hardy was promoted five times over a four-year period from 2010 to 2013 despite the fact that "he had less educational credentials, noticeably less work experience (including less experience with [LDH]), as well as questionable work performance/attendance." (Doc. 1 at 10–11). After he was promoted to the PM2 position in OBH, Hardy subjected Barnett to harassment in a variety of ways, including by causing morale problems with her staff, attempting to circumvent her authority, taking a computer from the locked office of one or her employees, entering her locked office on multiple occasions without her permission while she was not present, making false statements about her to their common supervisor, Karen Stubbs, and "sabotaging" a statewide training seminar she and her staff had prepared for "by canceling their GoTo Meeting account the night before the event for no reason and no forewarning." (*Id.* at 11–12). Barnett complained repeatedly to Stubbs about this harassment, but no steps were taken to address it. (*Id.* at 12).

In February 2013, LDH posted a second job announcement for the vacant PM4 position I OBH. (Doc. 1 at 13). Barnett alleges that Hardy "still met neither the professional level nor the supervisory experience requirements" LDH set for the position. (*Id.* at 13). On February 19, OBH Human Resources ("HR") Director Ruby Triggs informed Barnett that the decision to hire Hardy for the PM4 position "had already been made the year before" and he would be promoted to PM4 "as he had been promised." (*Id.* at 14). According to Barnett, LDH desired to promote Harvey

because he is a male and is under the age of 35, even though he was less qualified and performed poorly in his role as a PM2. (*Id.* at 15–16). However, the PM4 position remained unfilled in subsequent months. (*Id.* at 16). LDH then promoted Harvey to a PM4 position in the Medicaid Division in August 2013. (*Id.* at 17).

On November 12, 2013, LDH suspended Barnett. (*Id.* at 19). Barnett believes that the suspension was in retaliation for her complaints concerning Hardy's promotion. (*Id.*). LDH filed a report to the Louisiana Ethics Board "replete with falsehoods and lies" alleging that a conflict of interest existed involving Barnett and her husband's employment with an LDH contractor. (*Id.*). When Barnett had informed her supervisors of her husband's employment in the summer of 2012, they stated that there was no conflict of interest and that "nothing needed to be done." (*Id.* at 20). Despite the fact that LDH was aware of Barnett's husband's employment for over a year, it only decided to lodge the complaint after Barnett raised objections over Hardy's promotion. (*Id.* at 19).

On December 19, 2013, LDH informed Barnett that the ethics investigation revealed no wrongdoing. (Doc. 1 at 21). On January 6, 2014, Barnett was told to report to work the next day but that, instead of returning to OBH, she would work for LDH Deputy Secretary Courtney Phillips, which Barnett alleges constituted a demotion. (*Id.*). LDH refused to inform Barnett of the details regarding its ethics complaint and eventually admitted to her that it had never requested an advisory opinion from the Louisiana Board of Ethics. (*Id.* at 22–23). At the time of her demotion, Barnett was "the oldest staff member in her section working within the technical arena." (*Id.* at 23). In the subsequent months, Barnett complained to Assistant Secretary Rochelle Dunham, HR Director Lauren Guttzeit, Executive Counsel Steve Russo, and Deputy Undersecretary Courtney Phillips about "all of the discrimination, retaliation, mistreatment, and harassment that [LDH] had continuously subjected to her throughout the previous twenty (20)

months and her fear that she was again being wrongfully denied promotion to . . . the PM4 position." (*Id.* at 26). However, none of the four, who Barnett characterizes as "high level LDH executives," attempted to "stop it, mitigate it, or even investigate these claims much less the personal and professional damage she was suffering." (*Id.* at 27–28).

Subsequently, Barnett was transferred to Program Integrity ("PI"), though the discriminatory and retaliatory treatment "continued and in some cases worsened." (Doc. 1 at 28). Barnett filed suit against LDH in state court two weeks later on August 22, 2014. (*Id.* at 29). First, LDH "pressured" her to sign a "Conditional Offer of Employment," which provided that she would lose civil service protections, state benefits, and leave time in the event of a layoff. (*Id.*). Barnett refused to sign the document. (*Id.*). One month after the transfer, PI's Section Chief, John Korduner, "berated [Barnett's] work and efforts in front of her staff members." (*Id.*). At PI, Barnett had no input into the hiring of her first new staff member, a male who earned 18 percent more than she did despite the fact that "she was his supervisor and had infinitely more experience and academic credentials than he had." (*Id.*). Barnett requested a higher salary by filing for an Optional Pay Adjustment, which LDH denied. (*Id.* at 30). Barnett's supervisor, Quint O'Connor, informed her that PI's two upper-level managers (Korduner and Chief Compliance Officer Bill Root) did not speak well of her and "were looking for any opportunity to get rid of her." (*Id.*). Korduner and Root would hold meetings with Barnett's subordinates while excluding her, which was "humiliating and embarrassing" and impeded Barnett's ability to manage her team. (*Id.* at 31).

Barnett's direct supervisor, O'Connor, was "forced" by Root and Korduner to treat her poorly, which resulted in his filing "a formal request with LDH HR that either Root and Korduner cease attempting to harass, abuse, and mistreat [Barnett] through [O'Connor] or have her removed from his direct supervision." (Doc. 1 at 31–32). LDH responded by requiring Barnett to report

directly to Korduner, which was "devastating to her." (*Id.* at 32). In April 2015, Korduner and Root attempted to force Barnett to hire a "young, white male" who worked for the Louisiana Legislative Auditor and was auditing LDH. (*Id.*). Barnett believed that it was inappropriate for "an auditor to be seeking a job with the entity he was auditing," and that he was not qualified because he did not have "SAS programming experience." (*Id.*). As a result, on May 18, 2015, Barnett filed a "Confidential Request for Guidance" to HR Director Lauren Guttzeit. (*Id.* at 33). Subsequently, "both Root and Korduner increased the levels of hostility and isolation that they subjected her to so that they occurred on an almost daily basis." (*Id.*).

On June 26, 2015, Guttzeit responded to Barnett's confidential request by memorandum. (Doc. 1 at 34). In the memorandum, Guttzeit recited the contents of Barnett's complaint and disclosed the identities of the individuals interviewed during the investigation before concluding that no impropriety occurred. (*Id.*). The memorandum was sent to Root and Korduner, the subjects of the complaint, violating its confidentiality. (*Id.*). On July 6, Barnett was informed that "two of her three units of responsibility" were being removed from her supervision. (*Id.*). Barnett alleges that this constituted a "functional" demotion and was intended solely to "humiliate and retaliate against" her. (*Id.* at 35). That day, Barnett had suicidal thoughts, and two days later she visited a doctor. (*Id.*). The doctor recommended that she immediately be placed on family medical leave for her mental and physical health. (*Id.*). She remained on leave until July 27. (*Id.*). Korduner and Root continued to mistreat and harass Barnett after she returned. (*Id.* at 36).

In August 2015, Korduner, Root, and O'Connor met with Barnett regarding her annual evaluation of a younger white male subordinate ("Employee A"). (Doc. 1 at 36). They "repeatedly attacked" and "intimidate[ed]" Barnett "so that she would change the evaluation." (*Id.* at 37). Barnett refused, and Korduner threatened her that "there could be consequences against her over

her evaluation of the employee." (*Id.*). On August 12, O'Connor showed Barnett a "planning form" by Korduner which "included what he expected of O'Connor in the coming year." (*Id.*). Under a section entitled "People Development," Korduner wrote "prepare young staff for advancement." (*Id.*). Barnett alleges that this statement evidences LDH's discriminatory practice of hiring and promoting younger individuals. (*Id.*).

The same month, Barnett sought written testimony from other older women to whom Employee A had "directed disrespectful treatment towards." (Doc. 1 at 39). She amassed 40 pages of documentation "confirming Employee A's behavior and her attempts at remediation." (*Id.*). Barnett then consulted with HR representatives who informed her that she had "more than enough documentation to justify" the negative personnel evaluation. (*Id.*). On August 24, she met with Employee A to perform the evaluation. (*Id.*). He "stormed out of the room" four minutes after the evaluation began. (*Id.*). The next day, Barnett intended to work from home "to give Employee A an opportunity to settle down." (*Id.*). However, O'Connor informed her that she needed to take leave if she desired to work from home. (*Id.* at 40). Barnett was "stunned" and discovered the next day that her "work from home privileges were also taken away." (*Id.*). No staff member's ability to work from home changed other than Barnett and O'Connor. (*Id.*).

In the fall of 2015, Employee A's negative evaluation was "reversed by LDH HR with no logical explanation." (Doc. 1 at 41). Korduner had initiated his own investigation by filing a "formal grievance" during his review of the evaluation. (*Id.*). This violates an LDH policy prohibiting using the grievance process in conjunction with the evaluation review process. (*Id.*).

Barnett alleges that throughout her employment at LDH, "there has been a pattern and practice of discrimination against females evidenced in part by the promotions, raises given to, and/or hiring of white male employees over females," even where females are more qualified.

(Doc. 1 at 42). LDH has had the same pattern or practice with respect to individuals over 40 years old. (*Id.*). Barnett believes that LDH's protection of Hardy and Employee A are two examples of its discriminatory culture. (*Id.* at 41–43).

### 2. Instances of Age and Sex Discrimination Against Others

In her complaint, Barnett cites several examples of younger white male employees being hired or promoted over more experienced and/or more qualified older females. In 2013, Hardy interviewed Michael Carrone, a white male, and Kolynda Parker, an older African American female, for two vacant positions at OBH. (Doc. 1 at 43). Hardy offered Carrone the higher-level and higher-paying position, even though Parker was more qualified. (*Id.*). Subsequently, Carrone was promoted to replace Hardy as PM2 of OBH's Business Intelligence/IT section over Parker and Annette Giroir, an older female, who were both more qualified. (*Id.* at 44). LDH also hired a young, white male, Jay Besse, to Hardy's former PM2 position despite the fact that Parker was more qualified and had more supervisory experience. (*Id.* at 44–45). Later, when the same two positions Hardy hired Carrone and Parker to were newly available, Hardy once again hired a younger while male to the higher-level position and relegated a more highly-qualified, older female to the lower-level position. (*Id.* at 45).

Korduner was promoted to a PM4 Section Chief position in the Office of Public Health ("OPH") over his own supervisor, "an older female with many years of healthcare experience at LDH." (Doc. 1 at 46). Korduner "was not even minimally qualified for the position by supervisory requirements but an exception was made for him." (*Id.*). He was chosen instead of two other applicants who were over the age of 60. (*Id.*).

Barnett was also passed over for a promotion to a PM4 position in favor of Joseph Foxhood, a white male who had served as a contractor for LDH. (Doc. 1 at 46). Barnett had higher

educational credentials and greater professional experience than Foxhood, including 25 years of professional experience compared to Foxhood's three. (*Id.*). Moreover, Foxhood was the supervisor who oversaw the appointments of Carrone and Besse over more qualified, older female candidates. (*Id.* at 47).

Tyler Carruth, a young white male, was promoted to PM4 position multiple times in three different sections over older, more qualified applicants including Barnett. (Doc. 1 at 48). The first promotion "occurred when an older female was unceremoniously and humiliatingly removed from her PM4 position to make way for Mr. Carruth even though he had no experience in her section." (*Id.* at 48–49). Carruth also received multiple promotions and pay raises throughout a period of time LDH salaries were supposedly frozen because of budget cuts, while Barnett received no promotions and only one four-percent salary increase during the same period of time. (*Id.* at 49). Barnett alleges that other younger male employees regularly received pay increases and/or earned higher salaries than more qualified older female coworkers. (*Id.*at 49–51).

Barnett alleges that a study conducted on LDH salaries in the area of information technology for the year 2013 revealed that "female salaries lag far behind their male counterparts," including in the amount of pay increases they receive over time. (Doc. 1 at 51). Barnett contends that "males have received well over twice the yearly compensation raises that females have received." (*Id.*). This demonstrates that LDH promotes males more than females, that the males' pay raises are larger, and "the base salary from which they are receiving raises is larger." (*Id.*).

### 3. Retaliation

In December 2015, Barnett filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 1 at 51). Since filing the charge, LDH has "continued to retaliate against . . . and discriminate against her based upon her gender/sex and/or her age."

(*Id.*).  One such discriminatory and retaliatory act occurred when LDH finally officially filled the PM4 position in OBH Barnett had applied for each of the 10 times it was posted from 2012 to 2016. (*Id.* at 51 & 54).  LDH responded to the charge by asserting that it had not discriminated against Barnett because it ultimately filled the position with someone other than Hardy. (*Id.* at 51–52).  But Barnett alleges that LDH "only confirmed her claims of discrimination and its pattern of discrimination by promoting Carrone" to the position, despite the fact that he had no technical education and little experience. (*Id.* at 52).  Barnett had again applied for the position. (*Id.*).  LDH promoted Carrone twice during the first two years of his employment at LDH, while it had never promoted Barnett in six years of employment "despite applying over 100 times for promotional opportunities." (*Id.*).  LDH also passed over an African American female with greater experience and education than Carrone when it promoted him to PM4. (*Id.*).

Barnett alleges that in many of the instances in which she applied for a promotion, she was more qualified than the person eventually hired. (Doc. 1 at 54).  Instead of hiring Barnett for the PM4 position to which she had repeatedly applied since 2012, LDH left the position vacant until 2016. (*Id.*).  Barnett asserts that LDH changed the requirements by making the position open only to employees in OBH to specifically exclude Barnett since she was no longer in OBH. (*Id.*).  After Carrone left the position in December 2017, LDH posted the position for an 11th time and removed the restriction on applicants in OBH. (*Id.* at 55).  Barnett also applied for several openings for PI Section Chief positions (while she was located in PI), but was denied an interview each time. (*Id.*).  Three males from outside PI were hired from January 2016 to May 2017, and "multiple young males who had vastly less experience and relevant education qualifications" than Barnett were interviewed instead of her. (*Id.*).

In 2016, four years after Barnett first complained of the discriminatory treatment, LDH initiated an investigation into her complaints and interviewed numerous female employees in Barnett's PI unit. (Doc. 1 at 56). These coworkers informed Barnett that they told the investigator "that gender and age discrimination were rampant within LDH and many included their own experiences with this discrimination." (*Id.*). On August 3, 2016, members of the LDH Legal Department interviewed O'Connor, who "rarely spoke with" Barnett after the interview. (*Id.*). LDH hired a new PI Section Chief that same month, and neither the Section Chief nor Barnett's supervisor "would ever meet with her alone" and avoided interacting with her, which was difficult for Barnett because to that point, "she and her supervisor, Quint O'Connor, had an excellent relationship." (*Id.* at 56–57). Barnett believes that O'Connor was "forced into this behavior" because he gave her "the highest possible score for a state employee" on her annual evaluation that year. (*Id.* at 57). Barnett was also blocked from a later transfer for which she was recommended by a coworker. (*Id.* at 57–58).

In October 2017, LDH's new PI Section Chief informed Barnett that when he was first hired in May 2017, he was told by HR employees to beware of Barnett, stating that "she is trouble," "she is a problem employee," "she will sue you," "she will file appeals against you," and "she will file grievances against you." (Doc. 1 at 58). Barnett then made the decision to leave LDH. (*Id.*). She is unable to work in healthcare because "any public or private sector health jobs in Louisiana were under the complete purview and control of" LDH; thus, she has sought work in the disaster management field. (*Id.* at 58–59).

Barnett alleges that LDH "treated her differently and constructively discharged her" because of her age and/or sex, and that "the reasons given for the actions taken against her," which are not explained in the complaint, "were pretextual." (Doc. 1 at 59).

**B.      Procedural History**

On August 22, 2014, Barnett brought suit in state court against Hardy, the Louisiana Department of Health & Hospitals, and its Secretary, Kathy Kliebert, in her official capacity. (Doc. 11-2). The allegations in that lawsuit begin with Barnett's application to the PM4 position in OBH in 2012 and Hardy's subsequent harassment. (*Id.* at 4–6). On October 28, 2015, Barnett filed an amended complaint in state court. (Doc. 11-3). The allegations in the amended complaint concluded with the reversal of Employee A's negative personnel evaluation late in 2015. (*Id.* at 36–37). In the state-court lawsuit, Barnett brought claims under the First, Fourth, and Fourteenth Amendments to the United States Constitution, the Louisiana Employment Discrimination Law, a state whistleblower protection provision (La. R.S. 23:967), and for Intentional Infliction of Emotional Distress. (*Id.* at 39–44). On April 6, 2017, the state court dismissed all claims against Hardy. (Doc. 11-4). The state court also dismissed all claims against Kliebert except for the official-capacity Intentional Infliction of Emotional Distress claim. (*Id.*).

On December 29, 2015, while still employed at LDH, Barnett filed her charge of discrimination with the EEOC. (Doc. 1 at 59 & Doc. 1-2). On June 21, 2016, she filed an amended charge. (Doc. 1 at 59–60 & Doc. 1-3). On September 26, 2017, the EEOC mailed Barnett a Notice of Right to Sue, providing Barnett 90 days within receipt of the notice to file her lawsuit. (Doc. 1-4).

**C.      Claims**

Barnett brings a total of seven claims: three under federal law and four under state law. Barnett's federal claims are brought pursuant to Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), and the Equal Pay Act. (Doc. 1 at 60–63 & 67–68). Under state law, Barnett asserts claims pursuant to the Louisiana Human Rights Act

("LHRA") (for discrimination on the basis of age and sex), Louisiana Employment Discrimination Law ("LEDL"), and the Louisiana Equal Pay for Women Act ("LEPWA"). (*Id.* at 63–67 & 68–70).

## II. STANDARDS OF REVIEW

### A. Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) is analyzed similarly to a motion under Rule 12(b)(6), as the Court accepts "well-pled factual allegations . . . as true and view[s] them in the light most favorable to the plaintiff." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). Under Rule 12(b)(1), the Court may consider: "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996). The Court must dismiss the case if it determines it does not have subject matter jurisdiction, and the party asserting jurisdiction bears the burden of demonstrating its existence. *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011).

### B. Rule 12(b)(6)

In ruling on a motion to dismiss under to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept all well-pled factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009). To defeat a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is "plausible on its face" if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). The complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Factual allegations need not be detailed, but "must be enough to raise a right to relief above the speculative level," *id.*, and "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" are not sufficient. *Iqbal*, 556 U.S. at 678.

## III. DISCUSSION

### A.  Subject Matter Jurisdiction (Doc. 16)

LDH asserts that it is entitled to sovereign immunity under the Eleventh Amendment against all of Barnett's claims under state law, in addition to her claim under the ADEA. (*See* Doc. 16-1). In response, Barnett acceded to the dismissal of her claims under the ADEA and Louisiana Equal Pay for Women Act. (Doc. 25 at 5–6). Accordingly, these claims are dismissed without prejudice. Barnett, however, opposes the dismissal of her other two state-law claims, arguing that Louisiana has waived its immunity against claims under the LHRA and LEDL in federal court by not raising the sovereign immunity defense in response to these claims in prior, unrelated lawsuits. (*Id.* at 4–5). The Court disagrees.

Under the Eleventh Amendment to the United States Constitution, states are immune from suit in federal court by a citizen. U.S. Const. amend. XI; *see also Lapides v. Bd. of Regents*, 535 U.S. 613, 616 (2002). "The state sovereign immunity doctrine is unique because it acts as an affirmative defense, while also containing traits more akin to a limitation on subject-matter jurisdiction." *Union Pac. R.R. Co. v. La. Pub. Serv. Comm'n*, 662 F.3d 336, 340 (5th Cir. 2011). Eleventh Amendment immunity bars a court's subject matter jurisdiction, "depriving federal courts of the power to adjudicate suits against a state."[1] *Id.* The immunity is not absolute, however,

---

[1] The phrase "Eleventh Amendment immunity" has been described by the Supreme Court as "convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the

and may be waived by the states. *Id.* States waive their right to immunity by "voluntarily consenting to suit," which occurs when a state "voluntarily invokes" federal jurisdiction or "makes a clear declaration that it intends to submit to federal jurisdiction."[2] *Id.* (internal quotation marks omitted). Congress may also abrogate a state's immunity to enforce the provisions of the Fourteenth Amendment. *Id.*

Here, as a state agency, LDH is entitled to sovereign immunity unless one of these exceptions applies. *See, e.g.*, *Richardson v. S. Univ.*, 118 F.3d 450, 452 (5th Cir. 1997) ("[A] plaintiff cannot avoid the sovereign immunity bar by suing a state agency or an arm of the State rather than the State itself."). And it is clear that Louisiana has not generally consented to suit in federal court. *Raj v. La. State Univ.*, 714 F.3d 322, 329 (5th Cir. 2013). Barnett contends, with no supporting legal authority, that the state of Louisiana has waived its sovereign immunity with respect to her LHRA and LEDL claims by not asserting the defense of sovereign immunity in certain past lawsuits when these claims were asserted against it. Without addressing the two specific cases in which Barnett claims Louisiana has "waived" the sovereign immunity defense by choosing not to assert it, the Court disagrees with Barnett's premise and was unable to locate any authority in this or other circuits standing for such a broad and sweeping proposition.

On the contrary, courts faced with similar arguments consistently hold that a litigation position taken in one case does not automatically constitute waiver in a subsequent case. *See, e.g.*, *Biomedical Patent Mgmt. Corp. v. Calif. Dep't of Health Servs.*, 505 F.3d 1328, 1339 (Fed. Cir. 2007) ("[W]here a waiver of immunity occurs in an earlier action that is dismissed, or an entirely

---

terms of the Eleventh Amendment." *Alden v. Maine*, 527 U.S. 706, 713 (1999). Instead, "the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today." *Id.*

[2] For example, a state waives its sovereign immunity by filing suit in federal court or removing a case to federal court. *E.g.*, *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 619–20 (2002). Here, LDH has not "invoked" federal jurisdiction by either filing suit or removing the lawsuit to this Court.

separate action, courts . . . have held that the waiver does not extend to the separate lawsuit.").  In fact, even where a lawsuit was previously voluntarily dismissed under Rule 41 and then refiled, featuring the same parties and many of the same claims, the Ninth Circuit Court of Appeals held that a waiver of immunity, like any other waiver, would not automatically carry over. *City of S. Pasadena*, 284 F.3d 1154, 1156–58 (9th Cir. 2002); *see also Biomedical Patent Mgmt. Corp.*, 505 F.3d at 1339 (noting that case law relied upon the plaintiff "does not support its contention that waiver of immunity in one suit should extend to a separate action *simply because* the action involves the same parties and same subject matter"); *Shieldalloy Metallurgical Corp. v. N.J. Dep't of Envtl. Prot.*, 743 F. Supp. 2d 429, 437 (D.N.J. 2010) ("[A] prior sovereign immunity waiver does not extend to a subsequent suit simply because that suit is between the same parties and involves the same subject matter as the previous suit.").  Indeed, not only does a waiver of immunity not extend to a separate lawsuit, but "any waiver, including one effected by litigation conduct, must be 'clear.'" *Biomedical Patent Mgmt. Corp.*, 505 F.3d at 1341.

Of course, it is axiomatic that if an immunity waiver in a prior suit does not extend to a subsequent suit between the same parties involving the same subject matter, a purported waiver certainly cannot extend from an unrelated suit to a subsequent case featuring different parties. *See, e.g.*, *Wagoner Cnty. Rural Water Dist. No. 2 v. Grand River Dam Auth.*, 625 F. Supp. 2d 1162, 1167–68) (N.D. Okla. 2008) (finding the Federal Circuit's reasoning in *Biomedical Patent* even more persuasive where the case at hand was "an entirely separate lawsuit" featuring new parties and different issues).  And Barnett does not contend that Louisiana has evidenced an otherwise "clear" intent to waive its sovereign immunity with respect to these claims.  Accordingly, the Court concludes that Louisiana has not waived its sovereign immunity with respect to Barnett's LHRA and LEDL claims and therefore dismisses these claims without prejudice.

## B.     Failure to State a Claim (Doc. 18)

Because the Court has already concluded that LDH is entitled to sovereign immunity on Barnett's claim under the LHRA, LDH's motion to dismiss this claim for failure to state a claim (Doc. 18) is denied as moot.

## C.     Abstention (Doc. 11)

In its first motion, LDH argued that the Court should abstain from hearing this lawsuit because of an "identical" case in state court. (*See generally* Doc. 11-1).  Barnett argues that the two lawsuits are not identical because they feature different parties, different claims, and the case at hand includes conduct from late 2015 to 2017 that is not featured in the state-court suit because Barnett filed that case in 2014 and amended the complaint in October 2015.  Even if the cases could be parallel, however, both parties agree that the majority of the factors federal courts apply to determine whether to abstain from hearing a lawsuit weigh against abstention.  Upon examination of the state-court case, the Court agrees with Barnett that the lawsuits are not identical and that the abstention factors weigh heavily in favor of retaining federal jurisdiction.

The doctrine of abstention first established by *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), "applies when suits are parallel, having the same parties and the same issues." *Stewart v. West. Heritage Ins. Co.*, 438 F.3d 488, 491 (5th Cir. 2006).  However, courts may abstain from a case only in "exceptional circumstances," as abstention is an "extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River*, 424 U.S. at 813.  The Supreme Court has identified six factors in determining whether exceptional circumstances exist to warrant the exercise of abstention:

> (1) assumption by either court of jurisdiction over a res; (2) the relative inconvenience of the forums; (3) the avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) whether and to what extent federal law provides the rules of decision on the merits; and (6) the

adequacy of the state proceedings in protecting the rights of the party invoking federal jurisdiction.

*Murphy v. Uncle Ben's, Inc.*, 168 F.3d 734, 738 (5th Cir. 1999) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 285–86 (1995) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, (1983))). No extensive discussion of each factor is necessary here, as several are not applicable and the majority of those that are strongly favor retaining federal jurisdiction.

As neither court has assumed jurisdiction over a res, the first factor "supports exercising federal jurisdiction." *Stewart*, 438 F.3d at 492. Next, the Fifth Circuit is clear that "[w]hen courts are in the same geographic location, the inconvenience factor weighs against abstention." *Id.* Thus, because both the state and federal courts here are located in Baton Rouge, Louisiana, the second factor clearly favors the exercise of federal jurisdiction. Third, there is no significant risk for piecemeal litigation here. The state and federal cases include different causes of action and the case in this Court includes factual allegations from late 2015 to 2017 that are not present in the state suit. As LDH concedes, this factor weighs against abstention. (Doc. 11-1 at 6).

Fourth, as the state-court suit has proceeded since 2014, discovery is underway, and several pretrial motions have been disposed of, that case is at a relatively advanced stage. Conversely, this lawsuit remains at the motion-to-dismiss stage, prior to the issuance of a scheduling order and discovery. Thus, the Court disagrees with Barnett's contention that "there is very little difference in the progress made in the two cases." (Doc. 14 at 7). Nevertheless, the Court does not concur with LDH's suggestion that this factor alone provides the basis for abstention. LDH cites to *American Disposal Services, Inc. v. O'Brien*, a Second Circuit case in which the court upheld a district court's decision to abstain from exercising its jurisdiction. Notwithstanding the fact that *O'Brien* is not controlling law in this circuit, there are several key distinctions between that case and the case at hand which militate in in Barnett's favor. There, contrary to our case, the plaintiff

had overlapping federal claims in both the state and federal lawsuits, and the Second Circuit further observed that there were "no issues in the federal claim that are not also present in the state court proceedings," which is patently not the situation here. *Am. Disposal Servs., Inc. v. O'Brien*, 839 F.2d 84, 88 (2nd. Cir. 1988). Moreover, the advancement of the state-court proceedings included "five days of factual hearings," and there is no suggestion of a comparable examination into the facts of the state-court case here. Thus, *O'Brien* cannot be considered to be "on all fours" with the case at hand. Moreover, even to the extent *O'Brien* were controlling law, LDH has pointed the Court to no authority holding that the fourth factor can outweigh each other factor where, as here, the rest weigh strongly against abstention.

The remaining factors do LDH no favors. After the Court's ruling on LDH's motion to dismiss on sovereign immunity grounds, all of Barnett's state-law claims are dismissed without prejudice. Thus, only federal claims remain, which weighs strongly in favor of the exercise of federal jurisdiction. *See Moses H. Cone¸* 460 U.S. at 26 ("Although in some rare circumstances the presence of state-law issues may weigh in favor [of abstention], the presence of federal-law issues must always be a major consideration weighing against [abstention].") (citation omitted). Finally, the last *Colorado River* factor weighs intuitively against abstention because, as Barnett has raised causes of action and factual allegations in this suit that are not a part of her state-court suit, the state court cannot possibly adequately protect all of the rights she asserts here.

Accordingly, the Court concludes that the two lawsuits at issue are not truly parallel and that the *Colorado River* abstention factors weigh heavily in favor of this Court's exercise of jurisdiction. In light of *Colorado River's* mandate that abstention "is the exception, not the rule," and is an "extraordinary and narrow exception" to the Court's "duty" to adjudicate the case before

it, the Court can find no justification for shirking that duty here. Thus, the motion to dismiss (Doc. 11) is denied.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, **IT IS ORDERED** as follows:

(1) The motion to dismiss Plaintiff's claims under state law and the Age Discrimination in Employment Act (Doc. 16) is **GRANTED**, and these claims are **DISMISSED WITHOUT PREJUDICE**;

(2) The motion to dismiss Plaintiff's claim under the Louisiana Human Rights Act (Doc. 18) is **DENIED AS MOOT**; and

(3) The motion to dismiss under the *Colorado River* abstention doctrine (Doc. 11) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>March 19, 2019</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**