# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **MICHELLE BARNETT** | **CIVIL ACTION NO. 17-1793** |
| **VERSUS** | **JUDGE JOHN W. deGRAVELLES** |
| **LOUISIANA DEPARTMENT OF HEALTH** | **MAG. JUDGE RICHARD L. BOURGEOIS, JR.** |

## RULING AND ORDER

Before the Court is a Motion for Partial Dismissal by Defendant, Louisiana Department of Health ("LDH"). (Doc. 38). Plaintiff, Michelle Barnett ("Plaintiff" or "Barnett"), opposes the motion. (Doc. 40). Oral argument is not necessary. After carefully considering the law, facts, and arguments of the parties, Defendant's Motion for Partial Dismissal is granted in part and denied in part.

## I. Relevant Factual and Procedural Background

### A. Plaintiff's Allegations

For the purposes of a motion to dismiss, the Court must accept the following factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

### 1. Background

On December 22, 2017, Plaintiff filed suit in this Court against LDH alleging that she was discriminated against on the basis of her age and gender during the course of her employment with LDH from 2012 to 2017. Plaintiff is a 51-year-old, white woman. (Doc. 1 at 3). On March 1, 2012, LDH transferred her from its Medicaid division to the Office of Behavioral Health ("OBH") as a Program Manager 2 ("PM2"). (*Id.* at 4). As of the date of her transfer, Plaintiff had 24 years of experience in Business Intelligence/Analytics ("BI") in the fields of finance, insurance, energy,

disaster management, education, information technology, and healthcare. (*Id.*). She earned a bachelor's degree in mathematics and a master's degree in applied statistics from Louisiana State University. (*Id.*). She was one of only 12 "SAS Advanced Certified Programmers" in the State of Louisiana and the only one at LDH. (*Id.*). She was accepted into the Healthcare Informatics doctoral program at Rutgers University. (*Id.*). She had staff and organizational management experience as an assistant actuary, vice president for a national corporation, chief forecaster for an energy company, president of an energy consulting company, department chair of a local college's mathematics department, and LDH's Assistant Section Chief of all physician's programs in Louisiana. (*Id.*). She also had "program management experience throughout her entire career." (*Id.* at 5). Plaintiff "managed the creation and build-out of OBH's entire data warehouse, various cross walks for communication with numerous data systems and databases on a state and federal level, data dictionaries, and design specifications essentially creating the elemental foundations of all BI functions agency-wide." (*Id.*). She also directed data collection for use in federal and state regulatory reporting, legislative requests, and other "ad hoc requests that are necessary to monitor operations agency-wide." (*Id.*). Additionally, Plaintiff "developed and implemented policies, protocols, and designs for system enhancements, system and database testing, data integrity, and was the BI lead person for all OBH agency rollouts of new initiatives, problems with existing programs, or initiatives which she led." (*Id.*).

## 2. Allegations of Discrimination

In May 2012, Plaintiff's supervisor, Randy Lemoine, retired and suggested that she apply for his position—Program Manager 4 ("PM4") and Section Chief of BI. (Doc. 1 at 6). Plaintiff applied for the position, was selected as one of the top five applicants, and was interviewed for the position. (*Id.* at 6–7). The hiring committee confirmed that Plaintiff was qualified, having been

"essentially serving in the PM4 position [and] working closely with Mr. Lemoine," and thus designated her as the top applicant for the position. (*Id.* at 7). Another applicant for the position, Joshua Hardy, was a male under the age of 35 who was not qualified for the position under LDH's criteria because he had only two years of post-baccalaureate experience and who, "upon information and belief, falsified information on his application for the PM4 Position to suggest that he possessed the minimum qualifications for the PM4 Position." (*Id.*). Lemoine's administrative assistant concluded that Hardy was not qualified and informed Lemoine that Hardy could not be included in the final cut of applicants. (*Id.*). "Lemoine responded to this fact by closing his office door and telling [his assistant] that he had no choice and he was being forced to include Hardy in the group of final applicants and to interview him for the PM4 Position." (*Id.* at 7–8).

Despite the fact that the Civil Service later "confirmed" that Hardy was not qualified, Hardy was given an "informal interview" by LDH, which Plaintiff alleges illustrates that OBH management "was aware that Hardy was not minimally qualified for a PM4 level position and thus was not eligible to be interviewed." (Doc. 1 at 8). However, despite the fact that Hardy was not qualified and Plaintiff was the most qualified applicant, LDH decided to leave the PM4 position unfilled. (*Id.*). Plaintiff alleges that "it was apparent" that LDH decided to leave the position unfilled until Hardy could gain the minimum work experience necessary to qualify for the position. (*Id.* at 8–9). Despite the fact that she was not officially promoted, Plaintiff continued to unofficially perform PM4 duties and would "fill in as the Section Chief" at the request of OBH management. (*Id.* at 9).

Hardy was promoted five times over a four-year period from 2010 to 2013 despite the fact that "he had less educational credentials, noticeably less work experience (including less experience with [LDH]), as well as questionable work performance/attendance." (Doc. 1 at 10–

11). After he was promoted to the PM2 position in OBH, Hardy subjected Plaintiff to harassment in a variety of ways, including by causing morale problems with her staff, attempting to circumvent her authority, taking a computer from the locked office of one or her employees, entering her locked office on multiple occasions without her permission while she was not present, making false statements about her to their common supervisor, Karen Stubbs, and "sabotaging" a statewide training seminar she and her staff had prepared for "by canceling their GoTo Meeting account the night before the event for no reason and no forewarning." (*Id.* at 11–12). Plaintiff complained repeatedly to Stubbs about this harassment, but no steps were taken to address it. (*Id.* at 12).

In February 2013, LDH posted a second job announcement for the vacant PM4 position in OBH. (Doc. 1 at 13). Plaintiff alleges that Hardy "still met neither the professional level nor the supervisory experience requirements" LDH set for the position. (*Id.* at 13). On February 19, OBH Human Resources ("HR") Director Ruby Triggs informed Plaintiff that the decision to hire Hardy for the PM4 position "had already been made the year before" and that he would be promoted to PM4 "as he had been promised." (*Id.* at 14). According to Plaintiff, LDH desired to promote Hardy because he is a male and is under the age of 35, even though he was less qualified and performed poorly in his role as a PM2. (*Id.* at 15–16). However, the PM4 position remained unfilled in subsequent months. (*Id.* at 16). LDH then promoted Hardy to a PM4 position in the Medicaid Division in August 2013. (*Id.* at 17).

On November 12, 2013, LDH suspended Plaintiff. (*Id.* at 19). Plaintiff believes that the suspension was in retaliation for her complaints concerning Hardy's promotion. (*Id.*). LDH filed a report with the Louisiana Ethics Board "replete with falsehoods and lies" alleging that a conflict of interest existed involving Plaintiff and her husband's employment with an LDH contractor. (*Id.*). When Plaintiff had informed her supervisors of her husband's employment in the summer

of 2012, they stated that there was no conflict of interest and that "nothing needed to be done." (*Id.* at 20). Despite the fact that LDH was aware of Plaintiff's husband's employment for over a year, it only decided to lodge the complaint after Plaintiff raised objections over Hardy's promotion. (*Id.* at 19).

On December 19, 2013, LDH informed Plaintiff that the ethics investigation revealed no wrongdoing. (Doc. 1 at 21). On January 6, 2014, Barnett was told to report to work the next day but that, instead of returning to OBH, she would work for LDH Deputy Secretary Courtney Phillips, which Plaintiff alleges constituted a demotion. (*Id.*). LDH refused to inform Plaintiff of the details regarding its ethics complaint and eventually admitted to her that it had never requested an advisory opinion from the Louisiana Board of Ethics. (*Id.* at 22–23). At the time of her demotion, Plaintiff was "the oldest staff member in her section working within the technical arena." (*Id.* at 23).

In the subsequent months, Plaintiff complained to Assistant Secretary Rochelle Dunham, HR Director Lauren Guttzeit, Executive Counsel Steve Russo, and Deputy Undersecretary Courtney Phillips about "all of the discrimination, retaliation, mistreatment, and harassment that [LDH] had continuously subjected to her throughout the previous twenty (20) months and her fear that she was again being wrongfully denied promotion to . . . the PM4 position." (*Id.* at 26). However, none of the four, who Plaintiff characterizes as "high level LDH executives," attempted to "stop it, mitigate it, or even investigate these claims much less the personal and professional damage she was suffering." (*Id.* at 27–28). Subsequently, Plaintiff was transferred to Program Integrity ("PI"), though the discriminatory and retaliatory treatment "continued and in some cases worsened." (Doc. 1 at 28).

Plaintiff filed suit against LDH in state court two weeks later on August 22, 2014. (*Id.* at 29). LDH "pressured" her to sign a "Conditional Offer of Employment," which provided that she would lose civil service protections, state benefits, and leave time in the event of a layoff. (*Id.*). Plaintiff refused to sign the document. (*Id.*).

In September 2014, PI's Section Chief, John Korduner, "berated [Plaintiff's] work and efforts in front of her staff members." (*Id.*). Also during this time and while employed with PI, Plaintiff had no input into the hiring of her first new staff member, a male who earned 18 percent more than she did despite the fact that "she was his supervisor and had infinitely more experience and academic credentials than he had." (*Id.*). Plaintiff requested a higher salary by filing for an Optional Pay Adjustment, which LDH denied. (*Id.* at 30). Plaintiff's supervisor, Quint O'Connor, informed her that PI's two upper-level managers (Korduner and Chief Compliance Officer Bill Root) did not speak well of her and "were looking for any opportunity to get rid of her." (*Id.*). Korduner and Root would hold meetings with Plaintiff's subordinates while excluding her, which was "humiliating and embarrassing" and impeded Plaintiff's ability to manage her team. (*Id.* at 31). Plaintiff's direct supervisor, O'Connor, was "forced" by Root and Korduner to treat her poorly, which resulted in his filing "a formal request with LDH HR that either Root and Korduner cease attempting to harass, abuse, and mistreat [Plaintiff] through [O'Connor] or have her removed from his direct supervision." (Doc. 1 at 31–32). LDH responded by requiring Barnett to report directly to Korduner, which was "devastating to her." (*Id.* at 32).

In April 2015, Korduner and Root attempted to force Plaintiff to hire a "young, white male" who worked for the Louisiana Legislative Auditor and was auditing LDH. (*Id.*). Plaintiff believed that it was inappropriate for "an auditor to be seeking a job with the entity he was auditing," and that he was not qualified because he did not have "SAS programming experience." (*Id.*). As a

result, on May 18, 2015, Plaintiff filed a "Confidential Request for Guidance" with HR Director Lauren Guttzeit. (*Id.* at 33). Subsequently, "both Root and Korduner increased the levels of hostility and isolation that they subjected her to so that they occurred on an almost daily basis." (*Id.*).

On June 26, 2015, Guttzeit responded to Plaintiff's confidential request by memorandum. (Doc. 1 at 34). In the memorandum, Guttzeit recited the contents of Plaintiff's complaint and disclosed the identities of the individuals interviewed during the investigation before concluding that no impropriety occurred. (*Id.*). The memorandum was sent to Root and Korduner, the subjects of the complaint, violating its confidentiality. (*Id.*).

On July 6, Plaintiff was informed that "two of her three units of responsibility" were being removed from her supervision. (*Id.*). Plaintiff alleges that this constituted a "functional" demotion and was intended solely to "humiliate and retaliate against" her. (*Id.* at 35). That day, Plaintiff had suicidal thoughts, and two days later she visited a doctor. (*Id.*). The doctor recommended that she immediately be placed on family medical leave for her mental and physical health. (*Id.*). She remained on leave until July 27. (*Id.*). Korduner and Root continued to mistreat and harass Plaintiff after she returned. (*Id.* at 36).

In August 2015, Korduner, Root, and O'Connor met with Plaintiff regarding her annual evaluation of a younger, white male subordinate ("Employee A"). (Doc. 1 at 36). They "repeatedly attacked" and "intimidate[ed]" Plaintiff "so that she would change the evaluation." (*Id.* at 37). Plaintiff refused, and Korduner threatened her that "there could be consequences against her over her evaluation of the employee." (*Id.*).

On August 12, O'Connor showed Plaintiff a "planning form" by Korduner which "included what he expected of O'Connor in the coming year." (*Id.*). Under a section entitled "People

Development," Korduner wrote "prepare young staff for advancement." (*Id.*). Plaintiff alleges that this statement evidences LDH's discriminatory practice of hiring and promoting younger individuals. (*Id.*). The same month, Plaintiff sought written testimony from other older women to whom Employee A had "directed disrespectful treatment towards." (Doc. 1 at 39). She amassed 40 pages of documentation "confirming Employee A's behavior and her attempts at remediation." (*Id.*). Plaintiff then consulted with HR representatives who informed her that she had "more than enough documentation to justify" the negative personnel evaluation. (*Id.*).

On August 24, she met with Employee A to perform the evaluation. (*Id.*). He "stormed out of the room" four minutes after the evaluation began. (*Id.*). The next day, Plaintiff intended to work from home "to give Employee A an opportunity to settle down." (*Id.*). However, O'Connor informed her that she needed to take leave if she desired to work from home. (*Id.* at 40). Plaintiff was "stunned" and discovered the next day that her "work from home privileges were also taken away." (*Id.*). No staff member's ability to work from home changed other than Plaintiff and O'Connor. (*Id.*).

In the Fall of 2015, Employee A's negative evaluation was "reversed by LDH HR with no logical explanation." (Doc. 1 at 41). Korduner had initiated his own investigation by filing a "formal grievance" during his review of the evaluation. (*Id.*). This violates an LDH policy prohibiting using the grievance process in conjunction with the evaluation review process. (*Id.*).

Plaintiff alleges that throughout her employment at LDH, "there has been a pattern and practice of discrimination against females evidenced in part by the promotions, raises given to, and/or hiring of white male employees over females," even where females are more qualified. (Doc. 1 at 42). LDH has had the same pattern or practice with respect to individuals over 40 years

old. (*Id.*). Plaintiff believes that LDH's protection of Hardy and Employee A are two examples of its discriminatory culture. (*Id.* at 41–43).

### 3. Alleged Discrimination Against Others

In her complaint, Plaintiff cites several examples of younger, white, male employees being hired or promoted over more experienced and/or more qualified older females. In 2013, Hardy interviewed Michael Carrone, a white male, and Kolynda Parker, an older, African-American female, for two vacant positions at OBH. (Doc. 1 at 43). Hardy offered Carrone the higher-level and higher-paying position, even though Parker was more qualified. (*Id.*). Subsequently, Carrone was promoted to replace Hardy as PM2 of OBH's Business Intelligence/IT section over Parker and Annette Giroir, an older female, who were both more qualified. (*Id.* at 44). LDH also hired a young, white male, Jay Besse, to Hardy's former PM2 position despite the fact that Parker was more qualified and had more supervisory experience. (*Id.* at 44–45). Later, when the same two positions to which Hardy hired Carrone and Parker were available, Hardy hired a younger, white male to the higher-level position and relegated a more highly qualified, older female to the lower-level position. (*Id.* at 45).

Korduner was promoted to a PM4 Section Chief position in the Office of Public Health ("OPH") over his own supervisor, "an older female with many years of healthcare experience at LDH." (Doc. 1 at 46). Korduner "was not even minimally qualified for the position by supervisory requirements but an exception was made for him." (*Id.*). He was chosen instead of two other applicants who were over the age of 60. (*Id.*).

Plaintiff was also passed over for a promotion to a PM4 position in favor of Joseph Foxhood, a white male who had served as a contractor for LDH. (Doc. 1 at 46). Plaintiff had higher educational credentials and greater professional experience than Foxhood, including 25 years of

professional experience compared to Foxhood's three. (*Id.*). Moreover, Foxhood was the supervisor who oversaw the appointments of Carrone and Besse over more qualified, older female candidates. (*Id.* at 47).

Tyler Carruth, a young, white male, was promoted to a PM4 position multiple times in three different sections over older, more qualified applicants including Plaintiff. (Doc. 1 at 48). The first promotion "occurred when an older female was unceremoniously and humiliatingly removed from her PM4 position to make way for Mr. Carruth even though he had no experience in her section." (*Id.* at 48–49). Carruth also received multiple promotions and pay raises throughout a period of time that LDH salaries were supposedly frozen because of budget cuts, while Plaintiff received no promotions and only one, four-percent salary increase during the same period of time. (*Id.* at 49).

Plaintiff alleges that other younger, male employees regularly received pay increases and/or earned higher salaries than more qualified, older, female coworkers. (*Id.*at 49–51). Plaintiff alleges that a study conducted on LDH salaries in the area of information technology for the year 2013 revealed that "female salaries lag far behind their male counterparts," including in the amount of pay increases they receive over time. (Doc. 1 at 51). Plaintiff contends that "males have received well over twice the yearly compensation raises that females have received." (*Id.*). This demonstrates that LDH promotes males more than females, that the males' pay raises are larger, and "the base salary from which they are receiving raises is larger." (*Id.*).

### 4.       The Final Years

In December 2015, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 1 at 51). Since filing the charge, LDH has "continued

to retaliate against . . . and discriminate against her based upon her gender/sex and/or her age." (*Id.*). One such discriminatory and retaliatory act occurred when LDH finally filled the PM4 position in OBH for which Plaintiff had applied each of the 10 times it was posted from 2012 to 2016. (*Id.* at 51, 54). LDH responded to the charge by asserting that it had not discriminated against Plaintiff because it ultimately filled the position with someone other than Hardy. (*Id.* at 51–52). Plaintiff alleges that LDH "only confirmed her claims of discrimination and its pattern of discrimination by promoting Carrone" to the position, despite the fact that he had no technical education and little experience. (*Id.* at 52). Plaintiff had again applied for the position. (*Id.*). LDH promoted Carrone twice during the first two years of his employment at LDH, while it had never promoted Plaintiff in six years of employment "despite applying over 100 times for promotional opportunities." (*Id.*). LDH also passed over an African-American female with greater experience and education than Carrone when it promoted him to PM4. (*Id.*).

Plaintiff alleges that in many of the instances in which she applied for a promotion, she was more qualified than the person eventually hired. (Doc. 1 at 54). Instead of hiring Plaintiff for the PM4 position to which she had repeatedly applied since 2012, LDH left the position vacant until 2016. (*Id.*). Plaintiff asserts that LDH changed the requirements by making the position open only to employees in OBH to specifically exclude Plaintiff since she was no longer in OBH. (*Id.*). After Carrone left the position in December 2017, LDH posted the position for an eleventh time and removed the restriction on applicants in OBH. (*Id.* at 55). Plaintiff also applied for several openings for PI Section Chief positions (while she was working in PI), but she was denied an interview each time. (*Id.*). Three males from outside PI were hired from January 2016 to May 2017, and "multiple young males who had vastly less experience and relevant education qualifications" than Plaintiff were interviewed instead of her. (*Id.*).

In 2016, four years after Plaintiff first complained of the discriminatory treatment, LDH initiated an investigation into her complaints and interviewed numerous female employees in Plaintiff's PI unit. (Doc. 1 at 56). These coworkers informed Plaintiff that they told the investigator "that gender and age discrimination were rampant within LDH and many included their own experiences with this discrimination." (*Id.*). On August 3, 2016, members of the LDH Legal Department interviewed O'Connor, who "rarely spoke with" Plaintiff after the interview. (*Id.*). LDH hired a new PI Section Chief that same month, and neither the Section Chief nor Plaintiff's supervisor "would ever meet with her alone" and avoided interacting with her, which was difficult for Plaintiff because to that point, "she and her supervisor, Quint O'Connor, had an excellent relationship." (*Id.* at 56–57). Plaintiff believes that O'Connor was "forced into this behavior" because he gave her "the highest possible score for a state employee" on her annual evaluation that year. (*Id.* at 57). Plaintiff was also blocked from a later transfer for which she was recommended by a coworker. (*Id.* at 57–58).

In October 2017, LDH's new PI Section Chief informed Plaintiff that when he was first hired in May 2017, he was told by HR employees to beware of Plaintiff, stating that "she is trouble," "she is a problem employee," "she will sue you," "she will file appeals against you," and "she will file grievances against you." (Doc. 1 at 58). Plaintiff then made the decision to leave LDH. (*Id.*).

She is unable to work in healthcare because "any public or private sector health jobs in Louisiana were under the complete purview and control of" LDH; thus, she has sought work in the disaster management field. (*Id.* at 58–59). Plaintiff alleges that LDH "treated her differently and constructively discharged her" because of her age and/or sex, and that "the reasons given for

the actions taken against her," which are not explained in the complaint, "were pretextual." (Doc. 1 at 59).

## B. Procedural History

On August 22, 2014, Plaintiff brought suit in state court against Hardy, the Louisiana Department of Health & Hospitals, and its Secretary, Kathy Kliebert, in her official capacity. (Doc.11-2). The allegations in that lawsuit begin with Plaintiff's application to the PM4 position in OBH in 2012 and Hardy's subsequent harassment. (*Id.* at 4–6).

On October 28, 2015, Plaintiff filed an amended complaint in state court. (Doc. 11-3). The allegations in the amended complaint concluded with the reversal of Employee A's negative personnel evaluation late in 2015. (*Id.* at 36–37). In the state-court lawsuit, Plaintiff brought claims under the First, Fourth, and Fourteenth Amendments to the United States Constitution, the Louisiana Employment Discrimination Law, the Louisiana Whistleblower Statute (La. R.S. 23:967), and for intentional infliction of emotional distress. (*Id.* at 39–44). On April 6, 2017, the state court dismissed all claims against Hardy. (Doc. 11-4). The state court also dismissed all claims against Kliebert except for the intentional infliction of emotional distress claim. (*Id.*).

On December 29, 2015, while still employed at LDH, Plaintiff filed her charge of discrimination with the EEOC. (Doc. 1 at 59; Doc. 1-2). On June 21, 2016, she filed an amended charge. (Doc. 1 at 59–60 & Doc. 1-3). On September 26, 2017, the EEOC mailed Plaintiff a Notice of Right to Sue, providing Plaintiff 90 days within receipt of the notice to file her lawsuit. (Doc. 1-4).

Plaintiff filed suit in this Court on December 22, 2017. She asserted a total of seven claims: three under federal law and four under state law. Plaintiff's federal claims are brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act

("ADEA"), and the Equal Pay Act. (Doc. 1 at 60-63, 67-68). Under state law, Plaintiff asserts claims pursuant to the Louisiana Human Rights Act ("LHRA") (for discrimination on the basis of age and sex), Louisiana Employment Discrimination Law ("LEDL"), and the Louisiana Equal Pay for Women Act ("LEPWA"). (*Id.* at 63–67, 68–70).

Defendant filed three motions in response to Plaintiff's Complaint: a Motion to Dismiss, or, alternatively, to Stay Proceedings, (Doc. 11); a Motion to Dismiss under Rule 12(b)(1), (Doc. 16); and a Motion to Dismiss under Rule 12(b)(6), (Doc. 18). This Court ruled on these motions on March 19, 2019. (Doc. 33). The Court dismissed Plaintiff's claims under state law and the ADEA without prejudice; the Court dismissed Plaintiff's claims under the LHRA as moot; and the Court denied Plaintiff's motion seeking dismissal under the *Colorado River* abstention doctrine. Plaintiff's claims under Title VII and the Equal Pay Act remain pending.

## II.    Motion to Dismiss Standard

In *Johnson v. City of Shelby, Miss*., 135 S. Ct. 346 (2014), the Supreme Court explained, "Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." 135 S. Ct. at 346-47 (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. 'Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed].'

*Ormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

> Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the 'assumption of truth' to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand, supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the 'reasonable inference' the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a 'reasonable expectation' that 'discovery will reveal relevant evidence of each element of the claim.' *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-00177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

The Fifth Circuit further explained that all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502-03 (5th Cir. 2014). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" "has been asserted". *Id.* at 503.

## III.     Discussion

The instant motion seeks dismissal "in part" of Plaintiff's "discrimination and retaliation claims" under Title VII and the Equal Pay Act based on timeliness. (Doc. 38 at 1). Defendant correctly states that the only claims that remain pending before the Court are Plaintiff's claims under Title VII and the Equal Pay Act. Defendant moves for a "partial" dismissal and explains, "LDH is not seeking full dismissal of Plaintiff's claims at this time; rather, LDH is simply seeking

to narrow down the extensive scope of Plaintiff's allegations (dating back to 2012) pursuant to the time limits that exist in law and equity." (Doc. 38-1 at 2). Specifically, Defendant argues: (1) No discrete acts of gender discrimination or retaliation before March 4, 2015 are timely; (2) No acts of harassment or of a "hostile work environment" before March 4, 2015 are timely; and (3) No acts in violation of the Equal Pay act before December 22, 2014 are timely. (*Id.*). The Court discusses each of these in turn. [1]

### A. Timeliness of Claims under Title VII

Under Title VII, "a plaintiff must file a charge of discrimination within 300 days of the alleged discriminatory act." *Harrison v. Estes Express Lines*, 211 F. App'x 261, 264 (5th Cir. 2006) (per curiam) (citing 42 U.S.C. § 2000e-5(e)(1)); *see also Nabors v. Metro. Life Ins. Co.*, No. 12-827, 2012 WL 2457694, at *2-3 (W.D. La. May 30, 2012), *report and recommendation adopted*, No. 12-827, 2012 WL 2427169 (W.D. La. June 26, 2012).

The United States Court of Appeals for the Fifth Circuit has observed that "[o]ne of the central purposes of the employment discrimination charge is to put employers on notice of 'the existence and nature of the charges against them.' " *Manning v. Chevron Chem. Co., LLC,* 332 F.3d 874, 878 (5th Cir.2003) (quoting *EEOC v. Shell Oil Co.,* 466 U.S. 54, 77 (1984)). A charge must be "in writing under oath or affirmation," must sufficiently identify the parties, and must generally describe the action or practices that are the basis of the complaint. 42 U.S.C. § 2000e–5(b); 29 C.F.R. § 1601.12(b). Although the governing regulations list specific information that should be contained in each charge, the regulations also provide that "[a] charge may be amended

---

[1] The Court notes that Plaintiff filed a prior suit in state court in August 2014, alleging many of the same facts that are before the Court in the instant matter, specifically the alleged discrimination and failure to promote in the 2012-2013 time period. The state court suit was amended in October 2015 to include allegations of facts extending into 2015. The motion presently before the Court seeks to dismiss many of the claims arising out of the allegations from this same time period. However, the motion presently before the Court argues that these claims should be dismissed because they are untimely and not because they were previously adjudicated. Therefore, under the standards applicable to a motion pursuant to Rule 12(b)(6), the Court will only consider whether Plaintiff's claims are timely.

to cure technical defects or omissions," and that such amendments "related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received." 29 C.F.R. § 1601.12(b).

"Under Louisiana law, '[w]hen tortious conduct and resulting damages are of a continuing nature, prescription does not begin until the conduct causing the damages is abated.' For the continuous tort doctrine to apply, 'the operating cause of the injury [must] be a continuous one which results in continuous damages.' It does not apply if 'the complained of actions by the defendant were simply the continued ill effects that arose from a single tortious act.'" *Williams v. Otis Elevator Co.*, 557 Fed. App'x. 299, 301-02 (5th Cir. 2014) (quoting *First Nat'l Bank v. Smith*, 29-350, p. 4 (La.App. 2 Cir. 4/2//97); 691 So.2d 355, 358; *Crump v. Sabine River Auth.*, 98-2326, p. 7 (La.6/29/99); 737 So.2d 720, 726; *Cooper v. La. Dep't of Pub. Works*, 03-1074, p. 6 (La.App. 3 Cir. 3/3/04); 870 So.2d 315, 323 (citing *Crump*, 737 So.2d at 728-29)).

"The continuing violation theory typically applies to hostile work environment claims." *Notariano v. Tangipahoa Par. Sch. Bd.*, 266 F.Supp.3d 919, 924 (E.D. La. 2017), *reconsideration denied*, No. CV 16-17832, 2018 WL 117 2959 (E.D. La. Mar. 6, 2018) (citing *Johnson v. Fluor Corp.*, 181 F.Supp.3d 325 (M.D. La. 2016)). "'Unlike in a case alleging discrete violations, a hostile environment plaintiff is not limited to filing suit on events that fall within this statutory time period because her claim is comprised of a series of separate acts that collectively constitute one unlawful employment practice.'" *Id.* (quoting *Johnson*, 181 F.Supp.3d 325). "'A continuing violation involves repeated conduct and cannot be said to occur on any particular day. It instead occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Id.* (quoting *Jurach v. Safety Vision, LLC*, 72

F.Supp.3d 698, 707 (S.D. Tex. 2014), aff'd, 642 Fed. App'x. 313 (5th Cir. 2016) (internal

quotations omitted)).

> The Fifth Circuit has explained the continuing violations doctrine this way:

> [The Fifth Circuit] has consistently held that the continuing violations doctrine is
> equitable in nature and extends the limitations period on otherwise time barred
> claims only when the unlawful employment practice manifests itself over time,
> rather than as a series of discrete acts. *Frank v. Xerox Corp.*, 347 F.3d 130, 136
> (5th Cir. 2003); *see also Huckabay v. Moore*, 142 F.3d 233, 238-39 (5th Cir. 1998).
> Under the continuing violations doctrine, a plaintiff is relieved of establishing that
> all of the alleged discriminatory conduct occurred within the actionable period, if
> the plaintiff can show a series of related acts, one or more of which falls within the
> limitations period. *Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002) (citing
> *Messer v. Meno*, 130 F.3d 130, 135 (5th Cir. 1997)). The end goal of the continuing
> violation theory is to 'accommodate plaintiffs who can show that there has been a
> pattern or policy of discrimination continuing from outside the limitations period
> into the statutory limitations period, so that all of the discriminated acts committed
> as part of this pattern or policy can be considered timely.' *Celestine v. Petroleos
> de Venezuella SA*, 266 F.3d 343, 352 (5th Cir. 2001); *see also Hardin v. S.C.
> Johnson & Son Inc.*, 167 F.3d 340, 344 (7th Cir. 1999).

*Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004).

> As this Court has explained:

> This 'doctrine does not automatically attach in hostile work environment cases, and
> the burden remains on the employee to demonstrate an organized scheme led to and
> included the present violation.' *Celestine v. Petroleos de Venezuella SA*, 266 F.3d
> 343, 351 (5th Cir. 2001) (citing *Messer v. Meno*, 130 F.3d 130, 135 (5th Cir. 1997))
> (emphasis added). Further, the doctrine 'requires the same type of discriminatory
> acts to occur both inside and outside the limitations period,' such that a valid
> connection exists between them. *Id.* (quoting *Martineau v. ARCO Chem. Co.*, 203
> F.3d 904, 913 (5th Cir. 2000)).

*Price v. PCS Nitrogen Fertilizer, L.P.*, Civ.A. 03-153-RET-DLD, 2010 WL 1005181, at *4 (M.D.

La. Mar. 15, 2010).

Here, Defendant generally argues that Plaintiff has brought claims of discrete acts of

discrimination under Title VII and claims of ongoing discrimination or a hostile work environment

under Title VII. Defendant does not specifically identify which of Plaintiff's allegations are

"discrete acts" and which are part of an ongoing and continuous nature.  Regardless, Defendant reaches the same conclusion:  Plaintiff filed her EEOC Charge of Discrimination on December 29, 2015; 300 days prior to December 29, 2015 is March 4, 2015; any claims of discrimination or retaliation occurring before March 4, 2015, are untimely.  (Doc. 38-1 at 4-8).

In opposition, Plaintiff contends that all of her claims under Title VII are timely because "all of [Plaintiff's] claims in this case arise from the opening of the PM4 Position [in 2012] and LDH's failure to promote her to fill it."  (Doc. 40 at 4-5).  Plaintiff points to the initial posting for the PM4 position in 2012 and the following eleven times that Plaintiff applied for the position through 2018 – each time the position was left open or awarded to a "young male with less education and experience".  (Doc. 40 at 5).  The remaining allegations constitute "background evidence in support of a timely claim" for failure to promote, retaliation, harassment, and hostile work environment that did not toll until after March 2015.  (*Id.*).  Overall, Plaintiff argues that she alleges a "persisting and continuing system of discriminatory practices in promotion or transfer" that was "animated by a spirit of unlawful discrimination" which equates, under the law, to a "continuing violation of Title VII."  (*Id.* (citing *Trevino v. Celanese Corp.*, 701 F.2d 397, 402 (5th Cir. 1983); *see also, Clark v. Olinkraft, Inc.*, 556 F.2d 1219 (5th Cir. 1977), *cert. denied*, 434 U.S. 1060, 98 S.Ct. 1251, 55 L.Ed.2d 772 (1978); *Glass v. Petro-Tex Chem. Corp.*, 757 F.2d 1554, 1561 (5th Cir. 1985)(quoting *Trevino, supra*, 701 F.2d at 403, n. 7))).

On the face of Plaintiff's well-plead Complaint, she alleges that: she was highly-qualified in terms of education and experience for not only the position for which she was hired, but also for those which she held and for which she applied, (Doc. 1 at 4-6); as early as May 2012, Plaintiff was led to believe that she was the top candidate for the PM4 position that was becoming available, and she was encouraged to apply, (*id.* at 6-7); a less-qualified, younger male was given preference

over Plaintiff for the position, (*id*. at 7-8); Plaintiff complained of these alleged discriminatory actions by way of an EEOC Charge of Discrimination, (*id*. at 8); instead of promoting Plaintiff to the PM4 position, the position was left open, presumably to allow time for the younger male applicant to gain the necessary level of experience to fulfill the position, (*id.* at 8-9); Plaintiff performed the duties of the PM4 position that remained open, and the younger male was announced as being promoted within LDH in August 2012, (*id*. at 9); the promotion of the younger male was to posture him for the PM4 position and was done to the exclusion of allegedly more qualified women, (*id*. at 9-10); the younger male began harassing Plaintiff with the full knowledge of the Defendant, (*id*. at 11-12); Plaintiff complained of the harassment "repeatedly", (*id*. at 12); the younger male was frequently absent from work and did not perform his job to Plaintiff's satisfaction, yet he was "rewarded" where other females were not, (*id*. at 12-13); in February 2013, the PM4 position was re-opened for application, (*id*. at 13); Plaintiff applied for the second time but was advised on February 19, 2013 that the younger male had been promised the position a year prior, (*id*. at 14); Plaintiff complained of the iniquities of the situation and was told that it was "not right", (*id*. at 15); the PM4 position remained open for months because Plaintiff threatened legal action, (*id*. at 16); the "harassment" and "discrimination" continued throughout 2013 because a friend of the younger male was hired to serve as supervisor over Plaintiff, (*id*.); Plaintiff complained in October 2013 when the younger male was promoted to a PM4 position in another department because he was unqualified and she was suffering discrimination, (*id*. at 17); Plaintiff discussed the "continuing discriminatory treatment" with her employer as well as the physical and mental effects for which she sought medical treatment, and she was placed on suspension in November 2013, (*id.* at 18-19); Defendant falsely accused Plaintiff of engaging in unethical behavior that was purportedly linked to a conflict of interest and escorted her from the office and

was advised that she could no longer have contact with Defendant's office, (*id.* at 19-20); the investigation cleared Plaintiff in December 2013, and she was told to report back to work on January 7, 2014, (*id.* at 21); Plaintiff was re-assigned to what she deemed to be a lesser position which was also "temporary", (*id.* at 21-22); through early 2014, Plaintiff discovered that Defendant lied to her about the substance of the ethics investigation and about internal handling of her former position, and she determined that not only was she demoted, but had been "passed over" for "100 positions" at LDH since complaining about their alleged illegal practices, (*id.* at 22-24); the PM4 position re-opened for a short time, and Plaintiff met with OBH leadership to discuss how she was "ideally suited" for the position but had been consistently "shut out", (*id.* at 25-26); Plaintiff discussed with Human Resources on February 13, 2014, her wrongful denial of promotion to the PM4 position and the ongoing "discrimination, retaliation, mistreatment, and harassment", (*id.* at 26-27); on February 20, 2014, she spoke with Executive Counsel about the same "discrimination, retaliation, mistreatment, and harassment", (*id.* at 27); another conversation with another high-level executive took place on March 5, 2014, (*id.*); no one made any attempt to investigate or stop the failure to promote, the discrimination, retaliation, mistreatment, or harassment, (*id.* at 27-28); Plaintiff was again moved to another position which her supervisor described as the "worst spot" to experience any change, and the "unlawful behavior" proved to continue for over a year by way of "systematic and protracted discrimination, retaliation, mistreatment, and harassment", (*id.* at 28-29); Plaintiff detailed examples of allegedly retaliatory and discriminatory behavior that occurred during her employment with LDH, including being "forced" to hire unqualified, young males to fill positions that would work with her, (*id.* at 29-33); based upon a "request for guidance" submitted by Plaintiff, an investigation ensued from May – July 2015, resulting in several supervisors being removed or demoted, and Plaintiff being humiliated, (*id.* at 33-35); Plaintiff was

on medical leave until July 27, 2015, due to this incident, (*id*. at 35); Plaintiff's supervisors were emboldened that they could continue "with their discriminatory, abusive, harassing, and retaliatory mistreatment" of Plaintiff as evidenced by three instances in August 2015, (*id*. at 35-40); Plaintiff alleges a continued "pattern and practice" of Defendant discriminating and harassing females in the workplace through 2016, (*id.* at 41-45); and in March 2016, Plaintiff was again passed over for the PM4 position in favor of a young male, a position for which she had applied over ten times over the course of years at LDH, (*id*. at 44-45).

In interpreting the allegations of the Complaint in favor of the Plaintiff, Plaintiff alleges a lengthy employment history with LDH, whereby she claims that she experienced discrimination, retaliation, harassment, and mistreatment related to her gender and age from 2012-2017. While certain acts are alleged with particularity as examples of the general and pervasive behavior of which Plaintiff complains, a reading the 70-page Complaint does not allow one to easily discern what constituted or should be deemed a "distinct act" of alleged discrimination and what constitutes background facts evidencing part of a broader, ongoing discriminatory work environment. For example, the PM4 position was not filled eleven times; it was posted or opened eleven times, but closed, remaining unfilled, over the course of 2012 – December 2015. Therefore, even these instances of alleged failures to promote may be interpreted as ongoing as opposed to distinct acts of the position being filled by someone other than Plaintiff.

The Complaint characterizes the pages of allegations as ongoing discrimination and harassment that was part of the Defendant's pattern and practice. In its motion seeking dismissal, even Defendant does not categorize the plead acts as "distinct" as opposed to part of a hostile work environment. While the Court recognizes that Plaintiff should not be allowed to simply lump all allegations together as a hostile work environment claim in order to render otherwise untimely

actions "saved" by the continuing violations doctrine, *Pegram v. Honeywell, Inc*., 361 F.3d 272, 280 (5th Cir. 2004), the Court also is not presented with arguments and authority of purported "distinct discriminatory acts". *See, e.g., Pike v. Office of Alcohol and Tobacco Control of the La. Dept. of Revenue*, 157 F.Supp.3d 523, 542-44 (M.D. La. Sept. 22, 2015)(where the defendant *specifically identified* "changes in job duties" as the distinct act of discrimination that rendered the plaintiff's claim untimely; the plaintiff argued that the change of job duties "was the onset of a continuing violation"; finding that the identified act of a change of job duties was a "discrete discriminatory act" and untimely but it could be used as evidence in support of the timely claims under Title VII)(citing *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)); *see also, e.g., Williams v. E.I. du Pont de Nemours and Co*., 154 F.Supp.3d 407, 424-25 (M.D. La. Dec. 30, 2015)(where, despite the plaintiff's argument that all of the alleged acts were related and should be assessed as part of the hostile work environment claim, the identified act of transferring and "writing up" the plaintiff was found to be distinct and untimely)(citing *Boyd v. Trinity Industries, Inc*., 2015 WL 3969464, *2 (M.D. La. June 30, 2015)(discrete adverse actions, cannot be lumped together with the day-to-day pattern of harassment in an effort to be saved by the continuing violation doctrine).

Further, Defendant does not identify which of Plaintiff's *claims*, as opposed to alleged acts, under Title VII should be dismissed as untimely. For example, Defendant simply moves the Court "to deem untimely all claims of discrete discrimination or retaliation occurring before" March 4, 2015. (Doc. 38-1 at 5). Defendant does not make a distinction, for example, between Plaintiff's failure to promote claim being untimely as opposed to the harassment claim. Defendant does not tie certain "acts" to certain claims. Whereas, Plaintiff ties all allegations together to support all claims. This leaves the Court asking which of the allegations of discrimination before March 4,

2015 does Defendant contend are purported "discrete acts" and based on what authority? Given the volume and breadth of allegations from March 2012 – March 2015, it is Defendant's duty to identify the specific "acts" it contends are distinct and untimely. It has not done so.

Because the Complaint alleges a related string of discriminatory actions, the Court is in a position where it must take the last discernible date of a purported discriminatory act and determine whether it is within 300 days of the Plaintiff filing an EEOC Charge of Discrimination. Plaintiff alleges discriminatory acts as late as March of 2016, but also alleges continued discrimination and harassment in the "Fall of 2015" and examples of three incidents in August of 2015. (Doc. 1 at 37-45). Plaintiff alleges that all of the acts in late 2015 through early 2016 were part of an ongoing and pervasive discriminatory and unlawful workplace environment. Given that the EEOC Charge of Discrimination was filed on December 29, 2015, the last act indeed fell within the 300-day time period, or after March 4, 2015. Therefore, the Court finds that Plaintiff's claims under Title VII are timely, and Defendant's motion is denied with regard to these claims.

### B. Timeliness of Claims under the Equal Pay Act

Equal Pay actions must be commenced within two years of accrual of the cause of action unless the violation is willful; then the time limit extends to three years. 29 U.S.C. § 255(a). A willful violation includes one due to the "reckless disregard" of the employer. *Blackmon v. Brookshire Grocery Co.,* 835 F.2d 1135, 1138 (5th Cir.1988). Sex-based, discriminatory wage payments constitute a continuing violation, and the Equal Pay Act is violated each time an employer presents an "unequal" paycheck to an employee for equal work. *Hodgson v. Behrens Drug Co*., 475 F.2d 1041, 1050 (5th Cir. 1973). Therefore, only the "wages due" within the applicable limitation period preceding the filing of suit are recoverable. *Hodgson*, 475 F.2d at 1051.

Defendant concedes that Plaintiff "alleged willful violation of the [Equal Pay Act], which entails the application of the three-year limitation period. (Doc. 38-1 at 9). Since suit was filed on December 22, 2017, all claims of violations of the Equal Pay Act prior to December 22, 2014, should be dismissed as untimely.

Plaintiff argues that "equitable tolling" should be applied because Plaintiff was "induced or tricked" into allowing the filing deadline to pass when Defendant "threatened to retaliate" against her. (Doc. 40 at 9 (citing *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95-96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)). However, the face of the Complaint reflects that Plaintiff repeatedly made complaints internally at LDH, filed formal charges of discrimination, and even filed suits other than the instant matter. While Plaintiff clearly plead that Defendant was "willful" in its actions, thereby implicating the longer limitations period, she does not sufficiently plead that she was induced, tricked or thwarted from meeting the proper filing deadline.

Based on the foregoing, the Court dismisses all claims for violations of the Equal Pay Act prior to December 22, 2014 as untimely. All claims for violations of the Equal Pay Act occurring after December 22, 2014 remain pending.

IV.     **Conclusion**

Accordingly,

**IT IS ORDERED** that Louisiana Department of Health's Motion to Dismiss (Doc. 38) is hereby **GRANTED IN PART AND DENIED IN PART**;

Defendant's motion is **GRANTED** in that all claims for violations of the Equal Pay Act occurring before December 22, 2014 are dismissed with prejudice.

Defendant's motion is **DENIED** in all other respects.

Signed in Baton Rouge, Louisiana, on March 10, 2020.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**